SECURITIES AND EXCHANGE
COMMISSION, Plaintiff–
Appellee,

v.

Ratilal K. PATEL, Defendant–Appellant.

No. 1160, Docket 94–6218.

United States Court of Appeals,
Second Circuit.

Argued March 31, 1995.

Decided July 24, 1995.

Randall W. Quinn, Sr., Litigation Counsel (Simon M. Lorne, Gen. Counsel, Eric Summergrad, Principal Asst. Gen. Counsel, Paul Gonson, Sol., S.E.C., Washington, DC, of counsel), for plaintiff–appellee.

Michael Resko (Hurwitz Stampur & Roth, New York City, of counsel), for defendant–appellant.

Before: MINER, ALTIMARI and CABRANES, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Ratilal K. Patel appeals from a judgment entered in the United States District Court for the Southern District of New York (Patterson, J.) in an action brought against him by plaintiff-appellee Securities and Exchange Commission ("SEC") for violations of federal securities laws. The judgment permanently enjoins Patel from future violations, orders him to disgorge $453,-203 in illegal profits plus prejudgment interest and bars him from serving as an officer or director of any public company. On appeal, Patel contends that the district court erred in calculating the "avoided losses" that it ordered him to disgorge. He also contends that the district court considered improper factors in barring him permanently from serving as an officer or director of any public company.

### BACKGROUND

The parties have no dispute regarding the factual background of this case. Patel was a founder, director and senior vice president for research and development of Par Pharmaceutical, Inc. ("Par"), a manufacturer of generic drugs. In November of 1987, Par submitted to the Food and Drug Administration ("FDA") an Abbreviated New Drug Application ("the Application") for a generic version of the drug known as Maxzide, which is used for the treatment of hypertension. The Application falsely represented that Par's generic Maxzide, of which sodium bicarbonate was an ingredient, had been tested in bioequivalency studies required by the FDA. This misrepresentation came in the form of a certificate of analysis for sodium bicarbonate. The certificate was backdated to conceal the fact that the bioequivalency studies were performed with a formulation of Maxzide that did not contain the sodium bicarbonate. Patel knew that the Application was false and, in February and March of 1988, sold 75,000 shares of common stock in Par. The average sale price was approximately $21.00 per share, and Patel realized a total of $1,576,358. It was not until July 24, 1989 that Par publicly disclosed that it was recalling its Maxzide tablets.

Par had experienced a number of adverse events before it revealed its problems with Maxzide. In July of 1988, a congressional subcommittee (the Dingell Subcommittee), which had begun an investigation into the generic pharmaceutical industry, focused on Par. A subcommittee subpoena for Par records was served on July 5, 1988, and the press later reported that Par was involved in the Dingell Subcommittee's inquiry into allegations of bribes and payoffs to FDA officials. It seems certain that this information had a negative impact on the price of Par's stock. Another, more serious, decline in the price of the stock occurred in October of 1988, following Par's announcement that it was a target of a grand jury investigation into various improprieties, including bribery, in the generic drug industry.

In April of 1989, the press reported that Ashok Patel, another Senior Vice President of Par, had resigned his position with Par and had agreed to plead guilty to unspecified charges. Later that month, the press reported the indictment of two FDA officials on bribery charges, in an article that referred to Par, Ashok Patel and Dilip Shah. Shah later resigned from the Board of Directors of a Par subsidiary known as Quad Pharmaceuticals, Inc. In May of 1989, the Dingell Subcommittee held public hearings in connection with its investigation into the generic drug approval process. The following month, there were negative press reports on the relationship between FDA officials and Ashok Patel and Dilip Shah. Thereafter, on July 11, it was reported that a third FDA employee had been criminally charged and, on July 17, it was reported that Par had agreed to plead guilty to a charge of providing an unlawful gratuity to an FDA employee. As was to be expected, all the negative news resulted in depressions in the price of Par stock.

When Par announced on July 24, 1989 that it was recalling its Maxzide product and suspending all shipments of the drug, it also announced that it had intentionally furnished a false report to the FDA during a recent inspection; that Ratilal Patel was taking a leave of absence from the company; that its vice president for regulatory affairs and its

executive vice-president were taking leaves of absence from the Board of Directors; and that the company was postponing its annual shareholders' meeting in light of the ongoing investigation. Following that announcement, the price of Par stock closed on July 24 at $8.375 per share, down $1.625 from the $10 closing price on Friday, July 21, the previous trading day. On July 25, the next trading day, the stock closed at $7.125 per share. The total decline from the July 21 closing price was $2.875 or 28.75%. On July 26, 1989, the third day after the disclosure, Par stock rallied from $7.125 to close at $7.625.

On September 8, 1989, Patel resigned as a director and senior vice president of Par and as a director of its subsidiary, Quad Pharmaceuticals, Inc. In March of 1992, he settled a securities fraud class action claim with the payment of 500,000 shares of Par stock valued at approximately $3,000,000. In January of 1993, Patel pled guilty to conspiracy to defraud the FDA in connection with the generic Maxzide Application and thereafter was sentenced to a 27–month term of imprisonment, two years of supervised release and a $25,000 fine.

The enforcement action giving rise to this appeal was commenced by the filing of a complaint by the SEC on July 7, 1993. In the complaint, the SEC alleged violations by Patel of various antifraud provisions of the federal securities laws: Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240–10b–5. Injunctive relief was sought, along with disgorgement of "avoided losses" plus prejudgment interest, assessment of civil penalties under the provisions of the Insider Trading Sanctions Act of 1984, 15 U.S.C. § 78u–1, and an order barring Patel from ever serving as an officer or director of a public company. Following a motion for summary judgment by the SEC, Patel conceded that he had violated the antifraud provisions and agreed that a permanent injunction against future violations would be appropriate. The district court denied the relief sought under the Insider Trading Sanctions Act but ordered the disgorgement of Patel's avoided losses plus interest in accordance with the computation suggested by the SEC. The district court also imposed a lifetime bar against Patel's service as an officer or director of any public company. As he did in the district court, Patel here challenges the manner in which his avoided losses were computed as well as the permanent employment ban imposed upon him.

## DISCUSSION

### I. Computation of Avoided Losses

Although Patel agrees that he should disgorge his ill-gotten gains on the basis of the losses he avoided by selling his shares before the public announcement of the negative information known to him, he takes the position that the formula suggested by the SEC and applied by the district court is unreasonable under the circumstances. The district court computed the loss by multiplying the $1,576,358 that Patel received from the sale of his stock by 28.75%, the percentage of the decline of Par stock between the closing price on July 21, the last trading day preceding the announcement on July 24 that Par was recalling its generic Maxzide, and the closing price on July 25. On appeal, Patel argues that this method of computation arbitrarily limits the time period for measuring the effect of the "inside information" on the stock price and fails to consider the effect on the price of various events that preceded the post-announcement decline.

In the exercise of its equity powers, a district court may order the disgorgement of profits acquired through securities fraud. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972). "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989); *see also SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C.Cir.1994). We have held that, where stock is purchased on the basis of inside information, the proper measure of damages is the difference between the price paid for shares at the time of purchase and the price of the shares shortly after the disclosure of the inside information. *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d

1301, 1308 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). In that case, we recognized that disgorgement of profits "merely deprives the [wrongdoers] of the gains of their wrongful conduct." *Id.*

█ It therefore seems necessary to examine the movement of a stock's price after the relevant information is made public in order to determine the proper measure of the illicit profit (or loss avoided) to be charged to one who traded illegally while in possession of the material, non-public information. *See SEC v. MacDonald,* 699 F.2d 47, 55 (1st Cir.1983) (en banc); *SEC v. Shapiro,* 494 F.2d 1301, 1305–07 (2d Cir.1974). It has been said that "the market itself may be the best indicator of how long it took for the investing public to learn of, and react to, the disclosed facts." *MacDonald,* 699 F.2d at 55. Here, Patel avoided losses when he sold his stock in advance of the July 24 recall announcement at a time when he had material, non-public information regarding the fraudulent generic Maxzide Application and its likely consequences.

Patel argues that the drop in price of Par stock was not entirely due to the recall announcement and therefore that not all the losses he avoided when he sold his shares are chargeable to him. Specifically, Patel notes that the stock was on a downward spiral or, as he puts it, "in freefall during the period beginning November 1987 through July 24, 1989." Patel asserts that the Par stock fell 17.26% from March 1988 to July 1988 in the absence of specific negative information; that the stock fell 8.63% following reports of the subpoena for Par's records in July of 1988; that the stock "quietly" declined 22.83% between the negative news reports in July and October of 1988; and that the October disclosure of the grand jury investigation resulted in a decline of 17.35%. Accordingly, Patel contends that the drop of 28.75% in the stock price that occurred between July 21, 1989 and July 25, the date following the recall disclosure, was not solely attributable to the disclosure. He also contends that the disgorgement calculation arbitrarily failed to consider the higher closing price of Par stock on July 26, the third day after disclosure, when the stock rallied from $7.125 to $7.625.

If the latter figure were used in the computation, the decline in price would have been 23.75% rather than 28.75%, resulting in avoided losses of $374,385 rather than $453,-203. Patel asserts that "the SEC's method produces an unrealistic result that exaggerates the effect of the disclosure of the 'inside information' on which appellant acted. In so doing, the SEC's disgorgement figure is not a realistic, reasonable approximation of appellant's 'avoided losses' and must be reduced." We disagree.

We think that the district court's calculation of avoided losses was appropriate and reasonable in all respects and not an abuse of discretion. *See SEC v. Posner,* 16 F.3d 520, 522 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995). While calculations of this nature are not capable of exactitude, we agree with the District of Columbia Circuit that any "risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City Fin. Corp.,* 890 F.2d at 1232. Applying this principle, we find that the district court was eminently reasonable in its approach to the issue of avoided losses in this case. There certainly was a rational basis for the court to conclude that the earlier negative announcements had been fully taken into account by the market and that the July 24, 1989 disclosure alone accounted for the 28.75% decline identified as of July 25. Likewise, it was reasonable to use July 25, the day following the announcement, rather than July 26, in making the calculation. District courts must be given wide latitude in these matters, and we have no difficulty in finding that the district court reasonably approximated the losses avoided by Patel that were causally connected to the securities fraud violations in this case.

## II. *Injunction Against Service as Officer and Director*

For violations of the antifraud provisions of the securities laws,

the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [the applicable

provisions] from acting as an officer or director [of a public company] if the person's conduct demonstrates substantial unfitness to serve as an officer or director. . . .

15 U.S.C. §§ 77t(e) and 78u(d)(2) (enacted in 1990).

In permanently enjoining Patel from serving as an officer or director of any public company at the behest of the SEC, the district court necessarily determined that Patel was substantially unfit to hold such positions. The court identified six factors that it considered in resolving the issue of substantial unfitness: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." These factors were suggested in a law review article by Jayne W. Barnard entitled *When is a Corporate Executive "Substantially Unfit to Serve"?*, 70 N.C.L.Rev. 1489, 1492–93 (1992).

Applying the factors suggested by Professor Barnard, the district court found: that Patel's violations were not egregious in comparison with those of others and in view of the size of the loss avoided; that Patel was a first-time offender; that in his position as officer and director of Par, Patel allowed the false Application to be submitted and obstructed the FDA investigation of the Application by providing a "switched sample" of Maxzide to an FDA inspector; that Patel "showed some scienter in his actions, although he did not engage in clandestine trading"; that he was the sole economic beneficiary of his insider trading; and that, because he was a founder of Par and abused his position as officer and director, "the likelihood of future misconduct is sufficient to warrant the imposition of the injunctive relief requested."

Patel contends that the district court improperly applied the factors it considered "by 'mixing' Patel's 'insider trading' with Par's submission of the false [Application] to the FDA." He further contends that, although his "conduct in the Maxzide affair gave rise to his 'insider' knowledge, it was not part of any 'scheme' to commit the securities law violation[s], and is not relevant to an analysis of his conduct" in respect of the violations. Patel claims that the district court's application of the six-factor test results in an almost even "split" between those factors that cut in his favor and those factors that cut against him. Moreover, Patel thinks that the district court should have taken into account the fact that criminal sanctions were imposed upon him and that he voluntarily settled the class action suit brought against him.

■■■■ The district court properly considered Patel's involvement in the "Maxzide affair" as part and parcel of his conduct in the securities law violations. His deception of the FDA, although perhaps not originally designed to obtain profits or avoid losses in the sale of his stock, set in motion the scheme that culminated in his breach of fiduciary duties and in the resultant detriment to investors. Also, the district court properly took into account the six factors that it identified in evaluating substantial unfitness. These factors are useful in making the unfitness assessment, although we do not mean to say that they are the only factors that may be taken into account or even that it is necessary to apply all these factors in every case. A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company.

We do find a problem in this case, however, with the district court's finding regarding the likelihood of future misconduct, which is always an important element in deciding whether the substantial unfitness found justifies the imposition of a lifetime ban. The only findings that the district court made in this regard were that "Patel was a founder of Par and used his position as an officer and director to engage in misconduct." This is merely a general statement of events and can in no way justify the prediction that future misconduct will occur.

Moreover, we think that it was error for the district court to say that the likelihood of future misconduct based on the foregoing statement "is sufficient to warrant the impo-

sition of the injunctive relief requested." The loss of livelihood and the stigma attached to permanent exclusion from the corporate suite certainly requires more. In a case in which we approved lifetime banishment as a common law remedy, we noted that the defendants "had committed securities law violations with a 'high degree of scienter' and that their past securities law violations and lack of assurances against future violations demonstrated that such violations were likely to continue." *Posner*, 16 F.3d at 521–22. Although it is not essential for a lifetime ban that there be past violations, we think that it is essential, in the absence of such violations, that a district court articulate the factual basis for a finding of the likelihood of recurrence.

Finally, we take note of the fact that the governing statute provides that a bar on service as an officer or director that is based on substantial unfitness may be imposed "conditionally or unconditionally" and "permanently or for such period of time as [the court] shall determine." We take these provisions to suggest that, before imposing a permanent bar, the court should consider whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially where there is no prior history of unfitness. In this connection, we do not think that it would be improper for the district court to take into account any prior punishment that may have been imposed in a criminal proceeding. If the district court decides that a conditional ban or a ban limited in time is not warranted, it should give reasons why a lifetime injunction is imposed.

## CONCLUSION

We affirm the judgment to the extent that it enjoins future securities law violations and orders the disgorgement of avoided losses. We reverse so much of the judgment as imposes a lifetime injunction on Patel's service as an officer or director of any public company, and we remand for further consideration of the issue in accordance with the foregoing.