SECURITIES and EXCHANGE
COMMISSION, Plaintiff,

v.

Mitchell S. DRUCKER and Ronald
Drucker, Defendants,

William Minerva, Relief Defendant.

No. 06 Civ. 1644(CM).

United States District Court,
S.D. New York.

Dec. 20, 2007.

Alexander Mircea Vasilescu, David Stoelting, Mark K. Schoenfeld, Amelia Anne Cottrell, New York City, for Plaintiff.

Charles George Eichinger, Charles G. Eichinger & Associates, P.C., Islandia, NY, for Defendants.

### DECISION ON RELIEF

McMAHON, District Judge.

The SEC and counsel for defendants have presented the Court with competing versions of final judgments against the various defendants in this matter.

The SEC seeks from the defendants Mitchell and Ronald Drucker, not only disgorgement, but civil penalties and an injunction that would restrain the Druckers from violating the securities laws in the future. As to Mitchell Drucker, the civil penalty sought is three times the amount of the losses avoided by all three defendants (including relief defendant Minerva). As to Ronald Drucker, the civil penalty sought is three times the amount of the losses he personally avoided. Finally, as against Mitchell Drucker, the SEC seeks an injunction barring him from serving as an officer and director of any publicly-held company.

The defendants object that the SEC's computation of the amount to be disgorged is incorrect; object to the imposition of any civil penalties; and object to the entry of any injunction.

For my rulings on these issues:

■ (I) AMOUNT OF DISGORGEMENT; The SEC calculates the amount to be disgorged by calculating the amount realized by each defendant via his insider or tippee sales and subtracting therefrom

the amount he would have realized if he had sold on October 22, after the inside information concerning NBTY's earnings was disclosed. The defendants argue that the proper amount to be disgorged is far less than the SEC calculates, because the stock dropped significantly after the defendants sold but before the inside information was disclosed. This first drop was occasioned by a rumor in the marketplace (from Salomon Smith Barney) to the effect that the earnings of NBTY were going to fall short of prior projections. Once that rumor hit the market on October 19, 2001, the stock of NBTY dropped 19.6% (JPTO Stipulated Fact No. 27). The Salomon Smith Barney rumor was confirmed in substantial part by the expedited press release from NBTY that came out after the market closed on October 19, 2001. The timing of the press release was directly related to the SSB rumor and the immediate impact it had on the market. The stock fell another 27.2% on the first day of trading after the press release came out (October 22). In defendants' view, the only disgorgeable amount is the difference between the price of the stock at the time the official earnings announcement came out and the price of the stock the following trading day—27.2% rather than the full 41% that the stock fell between the time of the tainted trades and the time the market absorbed the bad news about NBTY's earnings.

I agree with the SEC's calculation of the amount to be disgorged. It is true that the price of the stock dropped several hours before NBTY made its earnings announcement—indeed, the Salomon Smith Barney rumor caused NBTY to speed up the public release of the information. However, the jury necessarily found that Mitchell Drucker had obtained inside information about the earnings of NBTY before he began selling his and Minerva's stock on October 18, and before he telephoned his father and directed his father to sell NBTY stock, also on October 18. From the time Drucker acquired that inside information, he was barred from trading in, or causing anyone else to trade in, NBTY stock until such time as the information became public. Public announcements of adverse news are often preceded by rumors that start the downward movement of the stock price, but that does not insulate the insider from liability for the full amount of the price decrease that occurred after he traded illicitly. The entire episode consumed but a few hours—not nearly a year, as was the case in *SEC v. Patel*, 61 F.3d 137 (2d Cir.1995)—and the entire drop was connected to the news (first rumored, then confirmed) about the shortfall in NBTY's earnings. In *Patel*, the passage of a year between the tainted trades and public release of the inside information—during which year the stock price of the company was in "free fall"— meant that forces other than the inside information had affected the price of the stock. However, between October 18, when the Druckers made their illicit trades, and October 22, the only factor impacting the price of NBTY stock (according to the evidence in the record) was the earnings shortfall. It was his inside knowledge about that earnings shortfall that led Mitchell Drucker to trade for his own account and for Minerva's account, as well as to orchestrate trades by his father. Defendants are thus liable for every dime they realized from and after the time when Mitchell Drucker became aware of the inside information, which occurred (at the latest) early in the afternoon of October 18, 2001.

(2) MITCHELL DRUCKER'S LIABILITY: Much of defendants' counsel's letter is a plea for mercy on behalf of Mitchell Drucker. He will get no mercy from this court.

█ Mitchell Drucker is a lawyer who betrayed the trust of his client (who also

happened to be his employer) for his own benefit and for the benefit of his father and his best friend. He is liable not only for his own gains but for those realized by his tippees. *SEC v. Warde,* 151 F.3d 42, 49 (2d Cir.1998). The amount he must disgorge is the full amount realized by all three defendants: $138,174 for Mitchell Drucker, $51,116 for Ronald Drucker and $7,953 for William Minerva, plus prejudgment interest on the above amounts. The SEC calculates prejudgment interest through November 30 at $61,789.53 for Mitchell Drucker, $22,858 for Ronald Drucker and $3,556 for William Minerva; the Clerk of the Court should calculate prejudgment interest from December 1, 2007 through the date when judgment is finally entered. There is no persuasive reason why Drucker should not be liable for prejudgment interest; the fact that this case lingered for six years only means that he (and his father and his friend) had the use of their ill-gotten gains for a longer period of time than would otherwise have been the case.

The total amount due from Mitchell Drucker by way of disgorgement will be $197,243 plus prejudgment interest. However, while Drucker is solely liable for disgorging his entire ill-gotten gain and for the prejudgment interest thereon, he is jointly and severally liable for the amounts to be disgorged by Ronald Drucker and Minerva. To the extent that those individuals disgorge the amounts they realized and interest on those amounts, Mitchell Drucker's disgorgement amount will be correspondingly reduced.

■ The Court finds that Mitchell Drucker is liable for civil penalties in an amount equal to twice the sum of $197,243, or $394,486. In addition to betraying the trust of his client/employer, Mitchell Drucker (1) structured his trades on Octo-

ber 18 in the (vain) hope that they would not be noticed in the same way that a single sale of his entire block of NBTY stock would have been; (2) failed to cooperate with the NASD investigation into the trading in NBTY stock until his back was literally to the wall and he could no longer conceal his transgression, thereby misleading his employer and causing Harvey Kamil to give erroneous information to the NASD during the course of that investigation; and finally (3) committed perjury on the witness stand at the trial of this action. There is no reason to exempt him from paying civil penalties; indeed, I believe that a substantial financial penalty is necessary to persuade Mitchell Drucker not to engage in this sort of conduct again. Drucker's conduct, contrary to the argument made by his fine attorney, was indeed egregious and continues to be egregious, and he must be punished for it. In reaching this conclusion, I completely ignore the SEC investigation from the 1990s into trading in American Ship Building, which the SEC continues to press, but which I find an unpersuasive reason to do anything to Mitchell Drucker.

■ Finally, the Court grants the SEC's request for a permanent injunction against Mitchell Drucker's further violation of the securities laws as well as an officer and director ban. Mitchell Drucker has yet to take responsibility for what he has done. Convinced as I am that Drucker perjured himself during the trial, I can hardly rely on his assurance that he has no intention of trading in securities in the future. Perhaps the prospect of coming before this court on a contempt motion will provide Mitchell Drucker with the necessary impetus to avoid future misconduct. Furthermore, I am convinced, by the brazenness of his misconduct and by his cocky refusal to own up to it,[1] that this attor-

---

1. The Court came to the view that Mitchell Drucker was cocky about his misdeeds after

ney—who was supposed to be NBTY's "policeman," and who demonstrated utter indifference to both the law and to his client—is not fit to participate in the governance of any public company.

In the opinion of this court, Mitchell Drucker is lucky that he was not indicted for his illicit activity. Had he been convicted criminally, he would have gone to jail for several years and suffered the automatic loss of his law license. The penalty chosen by the Court for this civil violation is far from draconian, but anything less would be a slap on the wrist.

 (3) RONALD DRUCKER'S LIABILITY: The SEC's primary reason for seeking the imposition of maximum civil penalties against Ronald Drucker appears to be that he was the subject of a prior SEC investigation, which did not result in the bringing of any charges against him. As I have already mentioned, I do not find that a particularly persuasive reason to impose penalties in this case. Nor am I in the habit of punishing individuals for exercising their Fifth Amendment rights, as Ronald Drucker did at the beginning of the American Ship Building investigation (and civil penalties are a form of punishment). The question here is whether Ronald Drucker should be liable for anything other than disgorgement of his ill-gotten gains plus prejudgment interest. Nothing in the record before me persuades me that he should be. Ronald Drucker was not a fiduciary; and while I believe that he intuited that his son was telling him to trade because of non-public adverse information about NBTY, he himself did not possess or pass on inside information. He is a tippee, and he should be liable to disgorge the amount he realized as a result of his acting on the illegal tip. No other financial penalty is in order. The SEC's tendency to conflate the Druckers does not disguise

the fact that, while it makes a substantial case for imposing civil penalties against Mitchell, the facts that this court finds damning about the son have little or nothing to do with the father.

 I am, however, persuaded that Ronald Drucker should be enjoined from committing further violations of the federal securities laws. Ronald Drucker, a former New York City detective, was aware that he was selling his shares and his son's shares on the basis of inside information. At the very least because of the American Shipbuilding episode, he was well aware that trading on inside information was against the law. Drucker's refusal to question his son's directive and his immediate acquiescence in it demonstrates a contempt for the law and persuades me that there is a reasonable likelihood of future violations absent an injunction. There is, however, no need for an officer or director bar against Ronald Drucker.

(3) LIABILITY OF WILLIAM MINERVA: Minerva is jointly and severally liable with Mitchell Drucker for the amount of his illicit gain plus interest. The SEC seeks no other penalty and none will be imposed.

The SEC should submit final injunctions in accordance with this ruling for the Court's signature. Please have them to chambers no later than December 21 at noon.

observing him in court, both during his testimony and throughout the trial.