**UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**Richard F. SELDEN, Defendant.**

**Civil Action No. 05-11805-NMG.**

United States District Court, D. Massachusetts.

June 24, 2009.

Robert B. Baker, David E. Butler, Richard Mann Harper, II, Franklin C. Huntington, IV, Securities and Exchange Commission, Boston, MA, for Plaintiff.

Justin J. Daniels, Thomas J. Dougherty, Cale Patrick Keable, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

In this civil enforcement action concerning the violation of federal securities laws, the Securities and Exchange Commission ("the SEC") has moved for a post-judgment order barring the defendant from serving as an officer or director of a public company for a period of five years.

### I. *Factual Background*

The following facts are drawn from the SEC's complaint and, as part of the agreed-upon judgment entered in this case, are accepted as true for the purposes of this motion. Additional facts supplied by the parties, to the extent they are not inconsistent with the complaint, are discussed and considered in the relevant sections of analysis.

#### A. Background of Transkaryotic Therapies and Replagal

The defendant, Richard F. Selden, is the founder and former Chief Executive Officer ("CEO") of Transkaryotic Therapies, Inc. ("TKT"), a bio-pharmaceutical company based in Cambridge, Massachusetts. From 1996 through July 2005, TKT was a public company registered with the SEC whose stock was traded on the NASDAQ stock exchange. In July, 2005, TKT was acquired by Shire Pharmaceuticals Group, PLC ("Shire") and now exists as a wholly owned subsidiary of Shire. Selden served as CEO and as a director of TKT from

1988 until his resignation in February, 2003.

In the spring and summer of 2000, TKT and Selden sought to develop a drug for treating patients suffering from Fabry's disease, a rare genetic disorder affecting the kidneys and causing severe pain. Before applying for approval from the Food and Drug Administration ("the FDA") TKT was required to prove, through clinical studies, that its drug, Replagal, would be both safe and effective. As part of those studies TKT identified specific effects, known as "end points," that the trials would prove. TKT hoped that its pivotal Replagal study, known as TKT003, would demonstrate the drug's efficacy in treating pain.

Unfortunately, the primary analysis of Replagal did not demonstrate a statistically-significant effect on pain. In statistical terms the probability of a particular result is expressed as a "p value." The smaller the *p* value, the more likely it is that the effect observed was not randomly induced. A *p* value of 0.05 or less (indicating a 95% level of certainty that the observed effect was not randomly induced) is generally accepted as showing a statistically-significant effect.

In the primary Replagal study, application of the statistical analysis agreed to in advance by TKT and the FDA resulted in a *p* value of 0.19, far from an acceptable result. TKT subsequently changed its statistical method but the resultant *p* value, 0.08, was still not considered statistically significant. Two secondary pain analyses yielded *p* values of 0.02 and 0.05 but those studies had been pre-designated as merely supportive of the primary analysis (which failed to show any statistically-significant effect).

Despite the inconclusive results, TKT did not conduct further clinical studies because it was in competition with Genzyme, Inc. ("Genzyme") to develop the first drug for treating Fabry's disease. Gaining FDA approval before a competitor was especially important because the rarity of Fabry's disease meant that any drug treating the disease would be considered an "orphan drug" by the FDA. The "orphan drug" designation, intended to encourage research and development of treatments for rare diseases, grants a seven-year marketing exclusion (or monopoly) to the first drug to gain FDA approval. Consequently, in June, 2000, at Selden's direction, TKT filed a Biologics License Application ("BLA") with the FDA for marketing approval of Replagal based on the TKT003 clinical study.

**B. Selden's Misleading Statements**

Following TKT's submission of the BLA Selden made a number of materially misleading statements (or omissions) concerning the outcome of the Replagal clinical studies. In October, 2000, TKT presented a slide show to medical professionals and investors at a conference sponsored by the American Society of Human Genetics ("ASHG"). In that show it displayed, with Selden's specific approval, the *p* values for the secondary supporting analyses of Replagal but not the primary efficacy analysis that had failed to show a statistically-significant effect on pain. TKT's characterization of its pivotal clinical study misleadingly suggested to investors that it had been an unqualified success.

Selden made further misleading statements in response to a Complete Review Letter ("CRL") received from the FDA. FDA rules require that agency staff respond to a BLA within six months by either approving the application or providing the applicant with a CRL. On January 2, 2001, TKT received a CRL stating that Replagal failed to demonstrate clinical benefits necessary for FDA approval.

Specifically, the letter stated that Replagal's pivotal clinical trial for pain had failed to demonstrate a statistically-significant effect and that TKT's handling of the study data had introduced "unmeasurable bias" that was "both inappropriate and unacceptable" in a clinical study. As a result the FDA recommended that TKT conduct additional clinical studies and submit the results to the FDA.

On the following day, after the stock market had closed, TKT issued a press release, and filed a Form 8–K (incorporating that press release) with the SEC, addressing the CRL. Selden actively participated in drafting the release, approved the final version and was quoted in it. The press release stated that the FDA had asked for additional data and that TKT employees were working to provide the information. The press release was materially misleading because it did not disclose that, far from simply asking for more information, the FDA had informed TKT that its pivotal study failed to achieve its primary objective and recommended that TKT conduct additional clinical trials. The day after TKT issued its press release the company's stock price dropped by 9%.

After receiving the CRL, Selden and other TKT executives met with FDA officials on April 26, 2001. At that meeting TKT executives informed the FDA that the company would no longer seek approval for Replagal based on the drug's effect on pain. The remainder of the meeting focused on other avenues for approval, specifically, Replagal's effect on renal function.

Following the April 26, 2001, meeting, TKT and Selden continued to make misleading public statements by 1) asserting that the FDA had merely requested additional data, 2) providing evasive answers to direct questions of investors during conference calls about whether the FDA had requested more clinical trials and 3) failing to disclose that, in response to the FDA's negative assessment, it was changing its regulatory strategy by no longer relying on Replagal's effect on pain as the basis for obtaining FDA approval.

As part of the final stages of review of both TKT and Genzyme's BLAs, the FDA scheduled a two-day advisory committee meeting for the fall of 2002. Consistent with FDA practice, briefing materials concerning the BLAs were to be made publicly available on the FDA's website the day prior to the meeting. The briefing materials concerning TKT's application harshly criticized TKT's clinical data and indicated that the FDA could not draw any conclusions with respect to Replagal's effect on pain. The materials were also critical of Replagal's purported kidney and cardiac benefits.

Although the advisory committee meeting was postponed until early 2003, TKT received the briefing materials before they were made public and issued a press release concerning those materials after the stock market closed on October 2, 2002. The press release stated that the FDA found TKT's pain data to be "uninterpretable" and that TKT had therefore withdrawn its claim that Replagal was effective against pain as a basis for seeking approval. In a conference call with investors held only minutes later, Selden was repeatedly evasive and falsely stated that TKT had only recently learned of the FDA's position and that the company had just decided to change its approach to the application. On the following day TKT's stock price dropped by 61% from the previous day's close.

### C. Selden's Sale of Stock

Between May, 2001, and February, 2002, Selden sold 90,000 shares of TKT stock while he was aware of material, non-public

information concerning TKT's clinical trials and the status of its FDA application. Based on the closing price of TKT stock after that negative information was publicly disclosed in October, 2002, Selden avoided a loss of $1,664,000 by selling a portion of his stock while the price was artificially inflated as a result of misleading information in the market.

## II. *Procedural History*

The SEC initiated this civil enforcement action against Selden by filing a complaint on September 1, 2005. On January 1, 2008, the defendant moved for summary judgment on the grounds that the FDA had stated in a letter to the SEC that all of TKT's disclosures concerning Replagal were "correct." The Court denied that motion after a hearing held on February 20, 2008.

Sometime in the spring of 2008, the parties reached a settlement and on July 2, 2008, filed a proposed, consent judgment, which was entered by this Court on July 8, 2008. The judgment permanently enjoins Selden from violating certain federal securities laws and required him to pay disgorgement and a civil penalty in the aggregate amount of $1,166,417. The judgment also provided that, upon a motion by the SEC, the Court shall determine whether it is appropriate to enter an order barring Selden from serving as an officer or director of any public company and that, for purposes of such a motion, the allegations in the complaint would be accepted as true by the Court.

On September 2, 2008, the SEC filed a motion for entry of a five-year bar order, along with a proposed order. The defendant has filed an opposition to the motion, to which the SEC has subsequently replied.

## III. *Analysis*

### A. Legal Standard

Federal law grants courts the authority to

> prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [the antifraud provisions of securities laws] from acting as an officer or director of any [public company] if the person's conduct demonstrates unfitness to serve as an officer or director....

15 U.S.C. §§ 77t(e) and 78u(d)(2). Courts within the First Circuit have had little occasion to interpret that statute but the parties agree that the analysis outlined by the Second Circuit Court of Appeals in *Securities and Exchange Commission v. Patel* is appropriate for application in this case. *See* 61 F.3d 137, 140–42 (2d Cir. 1995).[1]

■ In considering whether a defendant's conduct demonstrated "substantial unfitness" to serve as an officer or director, the *Patel* court considered the following six factors:

> (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's

1. In *Patel* the Second Circuit considered the applicable statutes prior to their amendment by the Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 305(a), 116 Stat. 745, 779 (codified as amended at 15 U.S.C. §§ 77t(e) and 78u(d)(2)) (replacing "substantial unfitness" with "unfitness"). Despite the evident Congressional intent to establish a lower standard for imposing officer and director bars, the SEC appears content to rely primarily on cases applying the old standard and, consequently, this Court will as well.

economic stake in the violation; and (6) the likelihood that misconduct will recur.

*Id.* at 141 (internal quotation marks omitted). Although the above factors are helpful to the unfitness assessment, the Second Circuit cautioned that they are not the only factors that may be considered and that it is not necessary to apply all of the factors in every case. *Id.* District courts exercise "substantial discretion" in deciding whether to bar an individual from serving as an officer or director in a public company. *Id.*

**B. Application**

The SEC contends that an application of the *Patel* factors justifies barring Selden from serving as an officer or director of a public company for five years. The defendant responds that no bar is warranted under the facts of this case. In light of the dispute, this Court turns now to consider whether Selden's conduct supports imposing an officer and director bar under 15 U.S.C. §§ 77t(e) and 78u(d)(2).

**1. "Egregiousness" of the Violation**

The SEC asserts that Selden's violation of securities laws was egregious because it involved numerous misleading statements made over the course of several years, all while Selden continued to sell his holdings in TKT at an artificially inflated price. Selden responds with a number of arguments, including that 1) he did not make any affirmative misstatements, 2) TKT did make numerous detailed disclosures and warnings about the uncertainty of FDA approval, 3) the SEC provided no guidance on what should be disclosed, 4) he relied on the advice of experienced counsel, 5) the FDA believed TKT's disclosures to be "correct" and those disclosures were consistent with industry standards, and 6) Selden did not engage in insider trading and disclosed all of his stock sales.

In its reply memorandum, the SEC accuses Selden of attempting to deny liability in spite of the agreed upon judgment entered in this case and the provision that the facts of the complaint will be accepted as true for the purposes of this motion. It also moves to strike portions of Selden's opposition which it maintains are inconsistent with the allegations in the complaint.

This Court recognizes that the line between denying liability and arguing that violations were not egregious is a fine one. Selden is entitled to present evidence that mitigates the seriousness of his violations provided that 1) his contentions fall short of an outright denial of liability and 2) they do not contradict the allegations in the complaint.

With those limitations in mind, this Court concludes that there is evidence suggesting that Selden's violations were particularly serious. Specifically, Selden's misleading statements were not an isolated incident but, rather, part of a pattern of conduct that extended over a period of several years. *See Sec. & Exch. Comm'n v. Maxxon, Inc.*, Civ. No. 02–975, 2005 WL 6090229, at *5 (N.D.Okla. Mar. 11, 2005) (imposing five-year bar where, among other things, "Defendant made misleading statements over a period of years"). Furthermore, notwithstanding the defendant's assertion to the contrary, at least some of Selden's violations involved affirmative misstatements. For example, during an October 2, 2002, conference call with investors, according to the allegations in the complaint, Selden falsely stated that TKT only recently learned of the FDA's position on its BLA and that TKT had just decided to change its approach to the application. In reality TKT had been receiving negative feedback from the FDA since January, 2001, and reported to the FDA that it was changing its approach in April, 2001.

Although Selden contends that the FDA believed TKT's disclosures were "correct" and that the disclosures were consistent with industry standards, that argument is unpersuasive in light of the complaint's allegations (taken as true) that Selden repeatedly made false and materially misleading statements. With respect to Selden's reliance on the advice of counsel, the Court acknowledges the fact that many of Selden's disclosures were reviewed in advance by experienced counsel (not as evidence of a lack of liability, but as mitigating the "egregiousness" of the misconduct) but notes that 1) certain disclosures, such as the ASHG slide show, were not reviewed by counsel and 2) Selden personally decided to omit material from that slide show that rendered the overall presentation misleading.

**2. Selden's "Repeat Offender Status"**

It is undisputed that this case represents Selden's first and only violation of securities laws. The SEC maintains that it took such information into account in requesting only a five-year bar. The defendant argues that his status as a first time offender weighs heavily against the imposition of any bar. *See Sec. & Exch. Comm'n v. DiBella,* Civ. No. 04–1342, slip op. at 31–32 (D.Conn. Mar. 13, 2008) (imposing no bar where defendant was a first time offender and the SEC failed to demonstrate that it lacked assurances against future misconduct).

That Selden had not previously violated securities laws in over a decade as an officer and director of TKT certainly weighs in his favor. Whether it justifies imposing no bar, however, depends, at least in part, on the likelihood (or lack thereof) that he will commit such violations in the future, a point which is discussed in detail below.

**3. Selden's Position at TKT**

Again it is undisputed that, at the time of the violations at issue, Selden was a director and CEO of TKT. As CEO he was ultimately responsible for the company's public disclosures and his violations represent an abuse of authority at the highest level.

**4. Selden's Degree of Scienter**

The SEC argues that Selden acted with a high degree of scienter primarily based upon the deposition testimony of Dr. Thomas Schuetz ("Schuetz"), TKT's former Vice President of Clinical Affairs. Schuetz testified that in January, 2003, while TKT was preparing to attend the rescheduled FDA advisory committee meeting, he had conversations with Selden about whether TKT should disclose pain data from clinical studies at that meeting. Schuetz testified that Selden felt strongly that the company should not disclose the pain data because doing so "would precipitate a shareholder lawsuit ... because we had not disclosed the analysis...."

Schuetz also expressed skepticism about Selden's suggestion that he was unaware that the pain data analysis was not positive. Selden also apparently told Schuetz that he was unaware that TKT had presented the $p$ value on the slide at the ASHG meeting, an assertion Schuetz found to be "preposterous."

The defendant responds that the SEC's quotation of Schuetz's testimony is selective and misleading but he cites no evidence in the record to support an alternate interpretation of that testimony. He also maintains that his reliance on the advice of counsel mitigates his degree of scienter. *See, e.g., Howard v. Sec. & Exch. Comm'n,* 376 F.3d 1136, 1147 (D.C.Cir.2004) (stating that reliance on advice of counsel is "evidence of good faith, a relevant consideration in evaluating a defendant's scienter"). As discussed above, however, there is no

suggestion that Selden relied on counsel in designing the ASHG slideshow.

Finally, the defendant asserts that his limited stock sales during the relevant time period (less than 10% of his total holdings) fail to show scienter. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir.1996) ("the mere fact that insider stock sales occurred does not suffice to establish scienter"), *superseded by* Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b)(1)-(2). This Court agrees that Selden's disposition of a modest amount of his stock is not especially probative of his scienter. It nevertheless concludes that other conduct, particularly conduct identified in Schuetz's testimony, displays a significant degree of scienter.

**5. Selden's Economic Stake in the Violations**

Selden's sale of stock during the time when he was making misleading statements allowed him to avoid $1,664,000 in losses. As Selden points out, however, those stock sales represented only 10% of his holdings and, as a result of stock grants awarded to him during that same period, he actually owned more shares in early 2003 than he did in 2000. He also maintains that his stock sales were made for legitimate reasons. This Court concludes that Selden's economic stake in the violations was minimal given his total TKT holdings and, thus, adds little support to imposing a bar.

**6. Likelihood that Misconduct Will Recur**

The likelihood that the defendant will engage in future misconduct, as noted by the Second Circuit in *Patel,* is of particular importance when considering whether, or to what extent, an officer and director bar is appropriate. *See* 61 F.3d at 141–42 (finding the likelihood of future misconduct insufficient to justify a lifetime bar). According to the SEC, there is a strong likelihood that Selden will commit future violations given 1) his current role as the CEO of Network Biosystems, a privately-held, development stage biotech company, and 2) his lack of remorse and refusal to accept responsibility for his past violation.

Although Selden has not violated securities laws in the past, this Court concludes that his current employment in the biotech industry in a position of authority creates the risk that such a violation could recur. Network Biosystems is not currently a public company but, should it become one, Selden would once again assume the ultimate responsibility of ensuring the accuracy of the company's public statements. His abuse of such authority in the past and his refusal to accept full responsibility in this case (as evidenced, in part, by his repeated "reliance on counsel" defense) demonstrates, at the very least, a lack of adequate assurance against future misconduct. *See Sec. & Exch. Comm'n v. Levine,* 517 F.Supp.2d 121, 146 (D.D.C.2007) (failure to acknowledge wrongdoing or show contrition favors a finding of unfitness); *Sec. & Exch. Comm'n v. Lawbaugh,* 359 F.Supp.2d 418, 426 (D.Md.2005) (finding a likelihood of recurrence based, in part, on the fact that the defendant had not expressed remorse).

**7. Other Factors**

The defendant cites additional factors which he asserts militate against imposing any bar. Specifically he notes that he has cooperated fully with the SEC during its investigation and that he has not served as an officer or director of a public company since 2003. The Court ascribes weight to those factors but notes that, despite cooperating, Selden's acceptance of responsibility has been less than stellar and that he

has assumed a position as CEO of another (albeit non-public) biotech company.

### C. Conclusion

Considering the circumstances of this case in light of the above factors, this Court determines that Selden is presently unfit to serve as an officer or director of a public company. Nevertheless a five-year bar is unwarranted in this Court's view. Together with the other penalties already imposed against him, a two-year bar is sufficient to ensure that Selden's misconduct will not recur and to impress upon him the seriousness of his violations. Such a penalty strikes the appropriate balance between protecting the investing public and not unduly limiting Selden's prospects for future employment.

## ORDER

In accordance with the foregoing, the SEC's motion for a five-year bar order (Docket No. 65) is **ALLOWED,** in part, and **DENIED,** in part. A two-year bar is imposed as more particularly set forth in the accompanying order.

**So ordered.**