FILED
United States Court of Appeals
Tenth Circuit

July 31, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSEPH P. NACCHIO,

    Defendant - Appellant.

No. 07-1311

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 05-CR-545-K)**

---

Maureen E. Mahoney, Latham & Watkins LLP, Washington, DC (Alexandra A.E. Shapiro, J. Scott Ballenger, and Nathan H. Seltzer, Latham & Watkins LLP, Washington, DC; and Herbert J. Stern and Jeffrey Speiser, Stern & Kilcullen, Roseland, NJ, with her on the briefs), for Defendant-Appellant.

Stephan E. Oestreicher, Jr., Attorney, Criminal Division, Department of Justice, Washington, DC (Troy A. Eid, United States Attorney, and James O. Hearty and Kevin T. Traskos, Assistant United States Attorneys, District of Colorado; and Leo J. Wise, Attorney, Criminal Division, Department of Justice, Washington, DC, with him on the briefs), for Plaintiff-Appellee.

Paul D. Kamenar and Daniel J. Popeo, Washington Legal Foundation, Washington, DC; Andrew J. Levander, David S. Hoffner, Jason O. Billy, and David P. Staubitz, Dechert LLP, New York, NY; and Michael L. Kichline, Dechert LLP, Philadelphia, PA, filed an amicus curiae brief for the Washington Legal Foundation in support of Defendant-Appellant.

Andrew H. Schapiro, Mayer Brown LLP, New York, NY; Evan P. Schultz, Mayer Brown LLP, Washington, DC; David B. Smith, English & Smith, Alexandria, VA; and Barbara E. Bergman, National Association of Criminal Defense Lawyers, Albuquerque, NM, filed an amicus curiae brief for the National Association of Criminal Defense Lawyers in support of Defendant-Appellant.

---

Before **KELLY**, **MCCONNELL**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Joseph Nacchio, the former CEO of Qwest Communications International, Inc. ("Qwest"), was convicted of nineteen counts of insider trading in federal district court. A divided panel of this court affirmed on several issues but held that certain expert testimony had been improperly excluded. On rehearing en banc, this court changed course, holding that the expert testimony was properly excluded, and affirmed Mr. Nacchio's conviction. *See United States v. Nacchio*, 519 F.3d 1140 (10th Cir. 2008), *rev'd and vacated in part on rehearing en banc*, 555 F.3d 1234 (10th Cir. 2009), *petition for cert. filed*, 77 U.S.L.W. 3559 (U.S. Mar. 20, 2009) (No. 08-1172). Now before the court are Mr. Nacchio's challenges to the district court's gain and forfeiture determinations. With regard to both, we hold that the district court erred. Consequently, we **REVERSE** the district court's sentencing order and **REMAND** for further proceedings consistent with this opinion.

# I. BACKGROUND

In December 2003, Mr. Nacchio was indicted and charged with forty-two counts of insider trading. The government alleged that Mr. Nacchio had made sales of shares of Qwest stock from January to May 2001 on the basis of material, nonpublic information. Specifically, the government alleged that Mr. Nacchio knew that Qwest was relying heavily on IRU (indefeasible rights of use) sales—a nonrecurring source of revenue—to meet its first- and second-quarter public guidance and that the company had not made the necessary shift to recurring revenue and, thus, it was at substantial risk of not meeting its year-end guidance.[1]

---

[1] The indictment charged that Mr. Nacchio was aware of material, nonpublic information, including:

(a) that Qwest's publicly stated financial targets, including its targets for 2001, were extremely aggressive and a "huge stretch"; (b) that in order to achieve its publicly stated financial targets for 2001, Qwest would be required to significantly increase its recurring revenue business during the first few months of 2001; (c) that Qwest's past experience or "track record" in growing recurring revenue at a sufficient rate to meet its publicly stated financial targets was poor; (d) that Qwest's recurring revenue business was underperforming from early 2001 and was not growing at a sufficient rate to meet Qwest's publicly stated financial targets; (e) that there were material undisclosed risks relating specifically to Qwest's recurring and non-recurring revenue streams that put achievement of Qwest's 2001 publicly stated financial targets in jeopardy; (f) that the gap between Qwest's publicly stated financial targets and Qwest's recurring revenue was increasing, thus increasing Qwest's reliance on risky and unsustainable one-time transactions; and (g) that there would be insufficient non-recurring revenue sources to close the gap between Qwest's publicly stated financial targets and its actual performance.

(continued...)

As thoroughly outlined in our initial panel opinion, since beginning as Qwest's CEO in 1997 Mr. Nacchio, who also was a member of the Board of Directors, had received a substantial portion of his compensation in Qwest stock options.[2] Except for sales according to an approved, fixed sales plan, Qwest policy only permitted officers to sell stock during short "trading windows" each quarter immediately after quarterly earnings were announced. At the beginning of 2001, Mr. Nacchio held just over 4.4 million vested options with an exercise cost[3]

---

[1](...continued)

Aplt. App. at 65-66.

[2]    *See generally* Kevin J. Murphy, *Explaining Executive Compensation: Managerial Power Versus the Perceived Cost of Stock Options*, 69 U. Chi. L. Rev. 847, 847 (2002) [hereinafter Murphy, *Explaining Executive Compensation*] (noting that "the increase in CEO pay in S&P 500 Industrials during the 1990s primarily reflects a dramatic growth in stock options"); Fischer Black & Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J. Pol. Econ. 637, 637 (1973) [hereinafter Black, *Pricing of Options*] ("An option is a security giving the right to buy or sell an asset, subject to certain conditions, within a specified period of time. . . . The simplest kind of option is one that gives the right to buy a single share of common stock.").

[3]    In exercising an option, the amount the holder pays for the stock technically is called the "exercise price." Black, *Pricing of Options*, *supra*, at 637; *see Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243 (10th Cir. 2000) ("A stock option gives the option holder the right to buy a share of stock at a fixed 'exercise price' . . . ."). In practical terms, this price is the cost to the holder of exercising the option. The district court referred to "the cost of the stock" to Mr. Nacchio. Aplt. App. at 1241-42. And the parties have not quarreled with this verbal formulation. *See, e.g.*, Aplt. Opening Br. at 54 (referring to "the cost of exercising the options"); Aplee. Br. at 69 n.42 (noting "the option costs"). Therefore, for purposes of this opinion, we adopt this formulation.

-4-

of $5.50 each.[4]  In 2001, the second-quarter trading window began on April 26, with Qwest's stock at $38.86 per share.  Between April 26 and May 15 of that year, Mr. Nacchio exercised some of his options and sold an average of 105,000 shares per trading day—totaling 1,255,000 shares—as the price fluctuated from about $37 to about $42 a share.

At the close of the second-quarter trading window in May, Mr. Nacchio entered into an automatic sales plan, approved by Qwest's general counsel, to exercise 10,000 options—i.e., sell 10,000 shares—a day as long as the stock price was at least $38 per share.  Between May 15 and May 29, Mr. Nacchio sold another 75,000 shares pursuant to this plan.  On May 29, 2001, Qwest's stock price dropped below $38 and remained there; Mr. Nacchio sold no more shares after that.  During this April to May period and thereafter, Mr. Nacchio continued to decline to disclose information regarding the breakdown of Qwest's revenue between IRU sales and recurring sources.

On July 24, 2001, Qwest issued a press release reporting its financial results for the second quarter of 2001 and the company hosted a conference call with investors in which it announced that its expected revenue for 2001 would be near the lower end of previously announced ranges.  On August 7, 2001, Mr. Nacchio gave a presentation in which he showed a slide reporting Qwest's annual

---

[4]     Mr. Nacchio also held a large quantity of $28.50 options, which are not at issue here.

actual and estimated IRU sales as a percentage of revenue from 1996 to 2001; this presentation was filed publicly with the U.S. Securities and Exchange Commission ("SEC"). Then on August 14, 2001, Qwest for the first time disclosed the magnitude of its 2000 and 2001 IRU sales in a filing with the SEC. Qwest's vice-president of investor relations testified that "there had been . . . some disclosure after the first quarter" that some of Qwest's revenue was one-time rather than recurring, "[b]ut . . . the magnitude was not known," until the August 14, 2001, filing. Aplt. App. at 1673. On September 10, 2001, Mr. Nacchio issued a press release lowering Qwest's public revenue targets for 2001 and for 2002.

Mr. Nacchio ultimately was convicted on nineteen counts of insider trading covering the trades that he had made from April 26, 2001, to May 29, 2001; he was acquitted of twenty-three counts covering earlier trades. The district court sentenced Mr. Nacchio to seventy-two months' imprisonment on each count, to run concurrently, and two years of supervised release on each count, also to run concurrently. The district court additionally assessed a $19 million fine and ordered him to forfeit approximately $52 million.

## II. SENTENCING

### A. *STANDARD OF REVIEW*

On appeal, Mr. Nacchio alleges that the district court committed procedural error in calculating his sentence because the district court incorrectly calculated

his "gain resulting from the offense" under U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2F1.2 (2000).[5] *See Gall v. United States*, 128 S. Ct. 586, 597 (2007) (describing procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range" and "selecting a sentence based on clearly erroneous facts"). Since *United States v. Booker*, 543 U.S. 220 (2005), this court has reviewed sentences for reasonableness, as informed by the 18 U.S.C. § 3553(a) sentencing factors. *See, e.g.*, *United States v. Munoz-Tello*, 531 F.3d 1174, 1181 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1314 (2009). "When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions *de novo* and factual findings for clear error, giving due deference to the district court's application of the [G]uidelines to the facts." *Id.* (internal quotation marks omitted).

> We interpret the Sentencing Guidelines according to accepted rules of statutory construction. In interpreting a guideline, we look at the language in the guideline itself, as well as at the interpretative and explanatory commentary to the guideline provided by the Sentencing Commission. [C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.

---

[5] All references are to the 2000 version of the Guidelines, which is the version used by the district court in sentencing Mr. Nacchio, unless otherwise specified. In 2001, §§ 2F1.1 and 2F1.2 were deleted by consolidation with § 2B1.1; U.S.S.G. § 2B1.4 now contains the same language as former § 2F1.2 regarding gain that is relevant to this analysis.

-7-

*United States v. Robertson*, 350 F.3d 1109, 1112-13 (10th Cir. 2003) (alteration in original) (citations and internal quotation marks omitted). Guidelines commentary is "treated as an agency's interpretation of its own legislative rule," i.e., "it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 44-45 (1993) (internal quotation marks omitted).

**B.    ENHANCEMENT ON THE BASIS OF GAIN RESULTING FROM THE OFFENSE**

**1.    *Insider Trading and U.S.S.G. § 2F1.2***

Mr. Nacchio was convicted under 15 U.S.C. §§ 78j and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-1. The statutes delegate the power to define criminal liability to the SEC by forbidding anyone from willfully using, "in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Those rules and regulations in turn prohibit purchasing or selling "a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence." 17 C.F.R. § 240.10b5-1(a). In other words, it is a crime for a corporate insider to "trade[] in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

Section 2F1.2 of the Guidelines specifically applies to insider trading

offenses and instructs that such an offense receives a base offense level of 8.
This base level is then increased according to "the gain resulting from the
offense." U.S.S.G. § 2F1.2(b)(1). The increase is calculated by reference to a
table found in § 2F1.1(b)(1), which prescribes progressively greater increases to
the offense level based on the relevant amount of gain. The language of §
2F1.1—a guideline covering fraud, deceit, and counterfeiting offenses—actually
specifies that the monetary amount is the amount of "loss" identified in the
offense. The commentary to § 2F1.2, however, notes that "[b]ecause the victims
and their losses are difficult if not impossible to identify" in insider trading cases,
"the gain, *i.e.*, the total increase in value realized through trading in securities by
the defendant . . . is employed instead of the victims' losses." *Id.* § 2F1.2 cmt.
background.

### 2. *The District Court's Gain Calculation*

For each act of insider trading for which Mr. Nacchio was convicted, the
following actions took place: (1) Mr. Nacchio made a command to exercise a
certain number of options; (2) his broker short sold that same number of shares[6]
and forwarded the proceeds to Qwest less a commission and fees; (3) Qwest
issued a corresponding number of shares, which were transferred to the broker;

---

[6]     A common definition for a "short sale" is the following: "A sale of a
security that the seller does not own or has not contracted for at the time of the
sale, and that the seller must borrow to make delivery." *Black's Law Dictionary*
1366 (8th ed. 2004).

(4) Qwest deducted both the exercise cost ($5.50 per share) and taxes from the proceeds of the sale; and (5) Qwest deposited the balance into Mr. Nacchio's bank account. The parties do not dispute that: Mr. Nacchio's gross proceeds from the relevant stock sales were $52,007,545.47; the cost of exercising the options was $7,315,000.00; the brokerage commissions and fees paid were $60,081.09; and the taxes paid were $16,078,147.81.

Prior to sentencing, the parties presented arguments to the district court regarding the appropriate amount that should be considered "gain" for purposes of increasing Mr. Nacchio's offense level under § 2F1.2(b)(1). The government argued to the district court that Mr. Nacchio's "gain resulting from the offense" pursuant to § 2F1.2(b)(1) was at least $44.6 million, i.e., the net profit Mr. Nacchio received from his stock sales during the April-May 2001 time period. That figure would equate to a 17-level increase to Mr. Nacchio's base offense level and a Guidelines range sentence of 70-87 months. U.S.S.G. § 2F1.1(b)(1)(R).

Mr. Nacchio asserted that his gain was much lower. As part of his response to the presentence report, Mr. Nacchio submitted an economic study by Professor Daniel Fischel—more specifically, an "event study"[7]—that estimated the portion

---

[7] *See generally United States v. Grabske*, 260 F. Supp. 2d 866, 867 (N.D. Cal. 2002) ("Economists often determine the amount of stock price inflation due to fraud through an 'event study.' An event study looks to how the

(continued...)

-10-

of Mr. Nacchio's proceeds from the sale of Qwest stock during the insider trading period that was attributable to inside information concerning Qwest's financial guidance and IRU issues. In the study, Professor Fischel analyzed the disclosures that were made after the time frame for which Mr. Nacchio was convicted—April 2001 to May 2001—and attempted to determine the effect of these disclosures on the price of Qwest stock. Professor Fischel's report outlined the financial economics techniques he applied and found that of the relevant disclosures only two events related to the disclosures, on August 22, 2001, and September 10, 2001, were statistically significant. Professor Fischel concluded that "the maximum portion of Mr. Nacchio's sales proceeds that would be attributable to inside information is $1,832,561 (i.e., 3.52 percent of $52,007,549)." Aplt. App. at 802. Thus, Mr. Nacchio argued for calculation of gain at $1.8 million, which would translate to a 12-level increase under § 2F1.1(b)(1)(M) and a Guidelines range of 41-51 months. The government responded that Mr. Nacchio's approach was contrary to that outlined in § 2F1.2 and that Professor Fischel's study was flawed.

---

[7](...continued)
price of the stock changed after the fraud was disclosed as evidence of the amount by which it was inflated prior to disclosure."); Kevin P. McCormick, *Untangling the Capricious Effects of Market Loss in Securities Fraud Sentencing*, 82 Tul. L. Rev. 1145, 1163-79 (2008) [hereinafter McCormick, *Untangling Capricious Effects*] (noting the use of event studies that "focus[] on the reaction that the market had to the revelation of the fraud").

The district court rejected both of these arguments and instead calculated Mr. Nacchio's gain to be approximately $28 million. As described further below, in calculating Mr. Nacchio's gain the district court primarily relied on the language of the commentary to § 2F1.2 and on the en banc holding of *United States v. Mooney*, 425 F.3d 1093 (8th Cir. 2005) (en banc). The district court rejected Mr. Nacchio's argument that the gain resulting from the offense should comprise only the proceeds that were attributable to Mr. Nacchio having traded on the basis of inside information. The district court also disagreed with the government's view that Mr. Nacchio's gain should include the amount that was put toward paying the taxes on the trades.

The district court noted that Mr. Nacchio's total net profit—i.e., his gross proceeds minus the cost to purchase the shares (i.e., the cost to exercise the options)—totaled $44,692,545.47, and it used that figure as a starting point. Next, the district court reasoned that the amount withheld for taxes was not "realized," as it was "not converted into money, cash or the equivalent." Aplt. App. at 1242.

Thus the district court subtracted this amount—totaling $16,078,147.81—to arrive at the conclusion that Mr. Nacchio's "true gain," "*i.e.*, the total increase in value realized through trading," was approximately $28 million. *Id.*; U.S.S.G. § 2F1.2 cmt. background. Under § 2F1.1(b)(1)(Q), this gain calculation resulted in

a 16-level increase to Mr. Nacchio's base offense level.[8]  Together with a 2-level increase due to Mr. Nacchio's abuse of a position of trust under U.S.S.G. § 3B1.3, the district court determined that the total offense level was 26, resulting in an applicable Guidelines range of 63 to 78 months.  The district court imposed a sentence of 72 months' imprisonment for each count, to be served concurrently.

### 3.    *Discussion*

Mr. Nacchio argues that to include for sentencing purposes the total amount he made on the stock sales as gain is punishing him "for the normal appreciation in Qwest's shares from 1997 to 2001, which had nothing to do with the offense charged."  Aplt. Opening Br. at 10.  Thus, Mr. Nacchio asserts that a "market absorption" approach should be utilized.  The district court rejected that approach, relying on (a) its interpretation of § 2F1.2 and the accompanying commentary; (b) its agreement with the rationale of the Eighth Circuit's majority approach in *Mooney*; and (c) its understanding of the offense and nature of the

---

[8]    Though not entirely clear, the district court's rationale suggests that it also wished to exclude from the gain calculation the amount paid in commissions and fees on the trades.  The district court pointed out that the PSR calculation did not exclude this amount, but the district court considered the commissions and fees, like the money withheld for taxes, to be "withheld and not received by defendant."  Aplt. App. at 1242 & n.3.  As the court pointed out, though, such a small discrepancy is immaterial under the ranges provided by § 2F1.1.  In light of our disposition, we need not determine where any discrepancies in the calculation lie; the district court will determine the gain anew under a different analytic framework that is focused on Mr. Nacchio's criminally culpable conduct.

harm of insider trading. For the reasons outlined below, we disagree with the district court's analysis and hold that Mr. Nacchio's gain should be calculated in a manner that is more narrowly focused on producing a figure that reflects, in at least approximate terms, the proceeds related to his criminally culpable conduct (i.e., trading on material, nonpublic information).

### a. United States v. Mooney

*United States v. Mooney* appears to be the only circuit decision squarely deciding the issue of gain under the insider trading sentencing guideline, and a discussion of that case is useful for understanding the dispute over the district court's gain calculation. 425 F.3d 1093. There, Mr. Mooney was convicted on securities fraud, mail fraud, and money laundering charges involving his participation in a scheme to defraud the company of which he was vice president and its shareholders while in possession of material, nonpublic information. *Id.* at 1095-97. Mr. Mooney purchased call options, i.e., options to buy shares of his company's stock at a fixed price, during his company's negotiations to acquire another company. He then sold the options at a profit following the public announcement of the acquisition. *Id.* at 1096.

The district court, relying on the commentary to the insider trading guideline, calculated Mr. Mooney's gain as the total amount realized from the sale of his options minus the amount he spent to purchase the options. *Id.* at 1096 & n.2, 1098. On appeal, Mr. Mooney argued that his gain amount under the

insider trading guideline should be computed based on the increase in the market value of the call options in the period *before* his inside information became public and was absorbed by the market. According to Mr. Mooney, proceeds for sales he made after the inside information was absorbed should not be included in the gain amount. *Id.* at 1098-99. Thus, his formula for gain regarding his criminal prosecution would apply the same type of disgorgement remedy sought by the SEC in the civil case against him. *Id.* at 1098.

A divided en banc Eighth Circuit, relying on its interpretation of the guideline and commentary, rejected a market absorption approach to defining "gain resulting from the offense" under § 2B1.4 (the current version of § 2F1.2). The *Mooney* majority first examined the "gain resulting from the offense" language of the guideline and opined that the phrase

> refers to the defendant's gain, not to market gain, and it ties gain to the defendant's offense. It speaks of gain that has resulted, not of potential gain. The guideline does not say "the gain in market value that has resulted from the offense"; such a phrase might support Mooney's theory, but that is not the language used.

*Id.* at 1099.

Next, the court stated that any question about the meaning of the guideline could be resolved by referring to the commentary, which describes "gain" as "the total increase in value realized through trading in securities by the defendant." U.S.S.G. § 2F1.2 cmt. background; *see Mooney*, 425 F.3d at 1099 (citing U.S.S.G.

§ 2B1.4 cmt. background (2002)).  The court stated that "the commentary uses common words with widely understood meanings" and determined that "[b]y use of the word realized, the commentary makes clear that gain is the total profit actually made from a defendant's illegal securities transactions."  *Mooney*, 425 F.3d at 1100.  The court reasoned that the proper measure of Mr. Mooney's gain "was the amount he actually realized by his trading in call options while he had material inside information": the entire profit he received when he sold the options less the purchase price of those options, with no consideration of when the market absorbed the inside information (or other extrinsic factors).  *Id.*

The majority further reasoned that Mr. Mooney had not demonstrated why a civil law approach should be "substituted for the guidance of the commentary," particularly as the guideline employs the concept of gain and "thus rejects the kind of remedy used in . . . the civil securities laws which [is] based on victim losses rather than the defendant's gain."  *Id.* at 1100-01.  The court additionally reasoned that Mr. Mooney's approach would be difficult to apply and that an imprecise standard is inappropriate in the criminal context.  *Id.* at 1101 ("The focus in § 2B[]1.4 [formerly § 2F1.2] on the increase in value realized by the defendant's trades provides a simple, accurate, and predictable rule . . . . The rule is also consistent with the guideline commentary." (citation omitted)).  Thus, the court held that the district court had correctly interpreted and applied the insider trading guideline.  *Id.*

-16-

The dissenting opinion would have applied a market absorption approach in calculating gain under the insider trading provision. *Id.* at 1106 (Bright, J., dissenting).[9] The dissent also focused on the guideline phrase "gain resulting from the offense," but it stated that the offense of insider trading "is not the purchase of stock itself, but the *use of a manipulative or deceptive contrivance in connection with* the purchase. The offense inheres not in the purchase itself, but in any deception that may be entwined with the purchase." *Id.* (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5). According to the plain language of the insider trading statute, the dissent reasoned:

> The offense is not the purchase, but the deception. The "gain resulting from the offense" is not the gain resulting from the purchase. It is, rather, the gain resulting from the deception.
>
> The gain resulting from the deception stops when the deception stops, though there may be later gain (or loss) as the stock market gyrates along, unmolested by any deception. If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public. That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock. After the market adjusts to this

---

[9]     Judge Bright's dissent from the majority's interpretation of § 2B1.4 was joined by two other judges. *See Mooney*, 425 F.3d at 1104-05 (Bye, J., concurring in part and dissenting in part) ("I am persuaded by Judge Bright's dissent as its reasoning appears to more effectively ensure against disparate sentencing for defendants convicted of identical offenses. While mindful of the strong arguments advanced by the majority, I am convinced § 2B1.4's use of the term 'gain' was not intended to subject defendants facing a loss of liberty to an unpredictable and erratic sentencing scheme driven by so fluid a marker as stock prices." (citation omitted)).

> information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market—with no deception—and thus, no offense under 15 U.S.C. § 78j—involved. Thus, if the person holds the stock for another five years after the insider knowledge has been made public, the value of the stock will continue to rise or fall regardless of the prior deception.

*Id.*

The dissent further argued that even if the plain language of the insider trading statute did not explain what "gain resulting from the offense" is, the majority's interpretation would be unreasonable as it does not promote uniformity in sentences for similarly situated defendants. *Id.* at 1106-07. The dissent offered a hypothetical—discussed in detail *infra* in Part II(B)(3)(b)(v)—of three insiders who made their profits trading in stock at different times to show how the majority's approach "means unequal justice for equal crimes." *Id.* at 1107. The dissent cited *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), to point out that "the ups and downs of the stock market are not causative of loss to the deceived parties." *Mooney*, 425 F.3d at 1108 (Bright, J., dissenting). Relatedly, noting that the "terms gain and loss are ordinary words with meanings that are similar whether they are used in a civil or a criminal context," the dissent reasoned that if the kind of gains related to the ups and downs of the market "are not a causative factor in a civil fraud or deception case, that obvious concept should not apply in a criminal case, where the stakes for a defendant relate not to money but to freedom from incarceration." *Id.*

-18-

### b.    Our Approach

Having considered not only the contrasting interpretations in *Mooney*, but also the parties' arguments, relevant statutes, case law, and other authorities, we conclude that the district court's gain computation approach does not square with the plain language of the relevant guideline, U.S.S.G. § 2F1.2, and its commentary; therefore, we reject it.  We further determine that it was incumbent upon the district court to adopt a realistic, economic approach (1) that would take into account that Mr. Nacchio's offense did not inhere in his sale of the shares itself, but in the *deception* intertwined with the sales due to his possession of insider knowledge, and (2) that consequently would endeavor to compute his gain for sentencing purposes based upon the gain resulting from that deception.

In an effort to provide guidance to the court on remand, we note that it is appropriate in some situations, including this one, to look to civil jurisprudence for guidance concerning the appropriate criminal sentencing approach.  And thereafter we specifically conclude that the civil disgorgement remedy provides an appropriate guidepost for sentencing in criminal insider trading cases.  Lastly, we highlight that our conclusions on these points are consonant with key objectives of federal sentencing policy.

### *i. Insider Trading and the Language of the Guidelines*

The plain language of § 2F1.2 supports the notion that an insider trading

-19-

defendant's "gain" should not consist of the total amount that the defendant realized from his or her stock sales, but should be limited more specifically to the gain that resulted from trading with insider knowledge. Section 2F1.2(b)(1) prescribes an increase corresponding to "the gain resulting from the offense." The essence of *the offense* of insider trading is not the trading itself—standing alone, a lawful act—but trading *on the basis of insider information.* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b5-1(a); *cf. Mooney*, 425 F.3d at 1105 n.9 (Bright, J., dissenting) ("[T]he plain language of the statute makes it clear what 'the offense' is.").

In other words, a corporate insider who trades without knowledge of material, nonpublic information is *not* committing the offense; nor is a corporate insider who has such inside information but does not trade while possessing it. Both elements—knowledge and deceptive action—are necessary to complete the offense. *Cf. Mooney*, 425 F.3d at 1105 n.9, 1106 (Bright, J., dissenting) ("The offense inheres not in the purchase itself, but in any deception that may be entwined with the purchase."); *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) ("[The insider trader]'s impropriety . . . consisted of selling his shares upon learning of the as yet unspecified difficulties."); 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 6:128, at 6-391 (2d ed. 2009) [hereinafter Bromberg, *Securities Fraud*] (discussing an insider's duty "to disclose or abstain" from trading while

possessing material, nonpublic information).

Because mere trading does not constitute criminal insider trading, it logically follows that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence. *Cf. United States v. Yeaman*, 194 F.3d 442, 456-57 (3d Cir. 1999) ("[T]he plain meaning of 'resulted from' connotes causation." (alteration in original) (internal quotation marks omitted) (discussing the Guidelines calculation of a loss amount under § 2F1.1 based on "'all harm that resulted from the acts and omissions specified'" (quoting U.S.S.G. § 1B1.3 (1997)))). As the *Mooney* dissent explained:

> [I]t is not enough to define "gain." We then must know what "the offense" is, because the guideline does not look to "gain" simply, but to the "gain resulting from the offense." Indeed, simply to take the definition of gain without limiting it to gain "resulting from the offense" would lead to absurd results. It is not *all* the defendant's stock gains—over an entire lifetime of stock trading, perhaps—that count[], but only the stock gains "resulting from the offense."

*Mooney*, 425 F.3d at 1105 n.9 (Bright, J., dissenting).

Moreover, in the Guidelines general application instructions, the commentary specifies that "'offense' means the offense of conviction [i.e., insider trading] and all relevant conduct." U.S.S.G. § 1B1.1 cmt. n.1(*l*). The relevant conduct guideline indicates that specific offense characteristics, such as the increase in offense level for gain under § 2F1.2(b)(1), are determined on the basis of factors including "all acts and omissions committed . . . or willfully caused by

the defendant . . . *that occurred during the commission of* the offense of conviction." *Id.* § 1B1.3(a)(1) (emphasis added). Thus, the general application instructions support the circumscription of the gain computation to that gain resulting from the deceptive nature of the action.

When properly interpreted, the commentary of the insider trading guideline—which describes gain as being "the total increase in value realized through trading"—does not support a different conclusion. *See United States v. Clayton*, 172 F.3d 347, 355 (5th Cir. 1999) ("In short, the commentary *properly interpreted* creates no conflict with the guideline." (emphasis added)). Of course, if the legally operative language of the guideline itself is clear, "it is not necessary to look beyond the plain language" of that guideline provision. *Robertson*, 350 F.3d at 1116. However, even if we do, as we explained in *United States v. Farnsworth*, "commentary should not be found to contradict the guideline" unless the "commentary and the guideline it interprets are inconsistent in that following one will result in violating the dictates of the other." 92 F.3d 1001, 1007 (10th Cir. 1996) (internal quotation marks omitted).

"[T]he proper application of the commentary depends upon the limits—or breadth—of authority found in the guideline that the commentary modifies and seeks to clarify." *Clayton*, 172 F.3d at 355; *accord United States v. Stolba*, 357 F.3d 850, 853 (8th Cir. 2004) (finding that application of the guideline to an example of conduct listed in the commentary is warranted only when that example

-22-

also fits within the specific temporal limits of the guideline). Here, the insider

trading guideline specifically limits the gain to that "resulting from the offense";

the "total increase in value" commentary language specifies how to calculate *that*

gain. The commentary's calculation instruction is thus applicable to the narrowly

defined "gain" that falls *within* the § 2F1.2(b)(1) definition. *See Clayton*, 172

F.3d at 355. Thus, no contradiction between the insider trading guideline

provision and its commentary arises: following the guideline will not result in

violating the dictates of the commentary, nor vice versa.[10] Gain should be

calculated as the commentary directs, i.e., as "the total increase in value realized

through trading in securities," but that calculation is applicable properly only to

"the gain resulting from the offense" specified in the guideline provision itself.[11]

_____

[10]     Even assuming that the two were inconsistent, the Supreme Court has made it clear that we must comply with the guideline rather than the commentary. *See Stinson*, 508 U.S. at 43.

[11]     This approach comports with another reference to "gain" in the Guidelines. Chapter 8 prescribes that in sentencing of organizations "[t]he seriousness of the offense generally will be reflected by the greatest of the pecuniary gain, the pecuniary loss, or the amount in a guideline offense level fine table." U.S.S.G. ch. 8 introductory cmt. (2008). "Pecuniary gain" is then described as "the additional before-tax profit to the defendant *resulting from the relevant conduct of the offense*." *Id.* § 8A1.2 cmt. n.3(h) (emphasis added). The application note provides the example of automobiles that are sold after having their odometers tampered with. "In such a case, the pecuniary gain is the additional revenue received because the automobiles appeared to have less mileage, *i.e.*, the difference between the price received or expected for the automobiles with the apparent mileage and the fair market value of the automobiles with the actual mileage." *Id.* Although clearly not an exact analogue, in that example as here "gain" would not include the underlying

(continued...)

-23-

### ii. The Need to Exclude Unrelated Market Factors from the Gain Computation

An approach that focuses on arriving at a figure that approximates the gain specifically resulting from Mr. Nacchio's offense would better recognize "the tangle of factors affecting price" that the Supreme Court addressed in *Dura Pharmaceuticals*. 544 U.S. at 343. That is not the approach taken by the district court here: its focus on the net profit Mr. Nacchio received from trading in securities during the fraud period effectively ignored the myriad of factors unrelated to his criminal fraud that could have contributed to the increase in the value of the securities. *Cf.* 4 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.12[3], at 195 (6th ed. 2009) ("When dealing with publicly-traded securities, many factors exist during the period in which violations take place that may affect the market price of the securities. These factors include general market or financial conditions, industry-wide conditions, or issuer problems unrelated to the violations in question. In these situations, courts try to establish *the value of the defendant's misrepresentation*." (emphasis added and footnotes omitted)).

---

[11](...continued)
*inherent value of the item*, be it a car or a share of stock. Just as the fair market value of a car free from tampering would not be attributed to the gain of a defendant convicted of odometer tampering, the underlying value of the share of stock, which is separable from the deceptive practice accompanying its purchase or sale, should not be attributed to an inside trader.

In *Dura Pharmaceuticals*, the Supreme Court held in a civil securities fraud case that a private plaintiff cannot prove that a defendant's fraud caused an economic loss simply by demonstrating that the price of the security was inflated on the date that he or she purchased the security. 544 U.S. at 342. The Supreme Court indicated that the variations of the stock market do not themselves cause fraud-related economic loss to such a plaintiff:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

*Id.* at 342-43.

Similarly, in a criminal securities fraud case, the Fifth Circuit cited *Dura*

*Pharmaceuticals* and recognized that stock price movements based upon factors unrelated to the defendant's offense should be excluded from a Guidelines loss determination. *See United States v. Olis*, 429 F.3d 540, 545-49 (5th Cir. 2005). In *Olis*, the defendant, a corporate executive, had been convicted of a massive accounting fraud. The district court calculated the loss using the testimony of only one witness regarding a single major shareholder's purchase price and sales price of the stock of defendant's company. *Id.* at 548. On appeal, the Fifth Circuit held that other factors should have been considered by the court.

The *Olis* court highlighted the value of "thorough analyses grounded in economic reality" in determining loss. *Id.* at 547. It held that the loss calculation could not be based simply on the absolute stock price decline, because stock has an inherent value and the district court's approach "did not take into account the impact of extrinsic factors" (unrelated to defendant's fraudulent conduct) on the decline in the stock's price. *Id.* at 548-49. Because the district court had failed to quantify or even consider other significant causes of the economic loss, the Fifth Circuit vacated the sentence. *Id.* at 546, 549 ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines. Where the value of a security declines *for other reasons, however, such decline, or component of the decline*, is not a loss attributable to the misrepresentation." (emphasis added)).

Mr. Nacchio's increased prison sentence should be linked to the gain

-26-

actually resulting from the offense, not to gain attributable to legitimate price appreciation and the underlying inherent value of the Qwest shares. The language of the guideline commentary supports the view that a stock's inherent value—i.e., the market's assessment of the stock's value, reflecting primarily the value of the firm's net assets and operations and its potential earnings and growth prospects—should not be a component of the gain amount: rather than "total value realized," the commentary describes gain as the "total *increase* in value realized"—contemplating that there is a baseline stock value from which the gain (i.e., increase) is measured. U.S.S.G. § 2F1.2 cmt. background (emphasis added); *see also SEC v. MacDonald*, 699 F.2d 47, 52-54 (1st Cir. 1983) (en banc) (holding that illicit gain in civil insider trading case is "increase in value" "causally related to the fraud"); *cf. Dura Pharm.*, 544 U.S. at 345 (noting that the federal securities statutes make private securities fraud actions available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1237 (C.D. Cal. 2002) (noting in criminal securities fraud prosecution that "[t]his is not a situation where the shareholders received worthless stock, but rather received stock worth less than they anticipated").

In *United States v. Leonard*, the Second Circuit vacated and remanded a criminal fraud loss calculation because the district court had computed the loss

amount as the entire cost of the securities sold by the defendants. 529 F.3d 83, 85 (2d Cir. 2008). There, the court reasoned that although investors might not have purchased the securities had they known certain information, that did not by itself "mean that the securities the investors received in exchange for their contributions were entirely without value. After all, the investors did obtain an interest in a company . . . . Accordingly, the district court erred in not deducting from the purchase price the actual value of the instruments." *Id.* at 93.

And in *United States v. Zolp*, in calculating loss for a securities fraud defendant, the Ninth Circuit held that the district court's factual finding that shares of stock were "worthless" after the fraud came to light was clearly erroneous "because the stock continued to have value during the fraud and even after the fraud came to light." 479 F.3d 715, 719-20 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *cf. United States v. Marcus*, 82 F.3d 606, 610 (4th Cir. 1996) (approving a gross sales measure of loss in an FDA fraud case when the district court had determined that the drugs affected by the fraud were worthless and consumers would not have purchased them at any price).

Likewise, here there is no indication that Mr. Nacchio's deception rendered Qwest's stock worthless. *See* Aplt. App. at 4763 (Qwest stock price on Sept. 21, 2001, closed at $19/share); *cf. U.S. SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1178 n.8

(10th Cir. 2006) (noting that the SEC sought disgorgement not of the entire proceeds of defendant's stock gain but instead the proceeds minus the market value of the stock at the time the market adjusted to disclosure of the inside information). Mr. Nacchio's benefit stemmed from the illicit, though speculative, effect of the material inside information on the value of Qwest stock. Under the government's prosecution theory, the market would have viewed the inside information in a negative light, and disclosure of that information would have detrimentally impacted the value of Qwest stock. Therefore, the nondisclosure of the information allowed the stock to maintain an artificially high value and allowed Mr. Nacchio to benefit from that value when he traded in the stock. It is that illicit, artificially high value that should be reflected in the gain calculation, not the underlying value of the stock.[12] *Cf. United States v. Snyder*, 291 F.3d

---

[12] We note that viewed from another perspective, such insider sales could be considered a form of "loss avoidance"—i.e., the insider is selling on the basis of inside information that he or she anticipates, once disclosed, will result in lower stock prices. *Cf. SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (noting that defendant in a SEC civil suit "agree[d] that he should disgorge his ill-gotten gains on the basis of the losses he avoided by selling his shares before the public announcement of the negative information known to him"); *SEC v. Shah*, No. 92 Civ. 1952 (RPP), 1993 WL 288285, at *4 (S.D.N.Y. July 28, 1993) ("[T]he SEC alleges that Shah profited during this period by engaging in insider trading and seeks recoupment of the losses Shah *avoided* by making those trades." (emphasis added)); 3 Bromberg, *Securities Fraud*, *supra*, § 6:335, at 6-894 ("The logical measure of insider trading disgorgement is the amount of profit made *(or loss avoided)* by the use of MNPI (material nonpublic information)." (emphasis added)). When seen through a loss-avoidance lens, it becomes even more apparent that the "total increase in value realized" language of the § 2F1.2

(continued...)

1291, 1296 (11th Cir. 2002) ("[T]he stock here was not totally worthless after the conspiracy was discovered. Thus, not every shareholder suffered a loss."); U.S.S.G. § 2F1.1 cmt. n.8(a) (noting that when a fraud involves misrepresentation of the value of an item—such as stock—that does have some value, as opposed to an item that is worthless, "the loss is the amount by which the stock was overvalued" as opposed to the entire fraudulently represented amount of its worth).

To be sure, as the reasoning of *Mooney*'s majority suggests, due to its simplicity, a net-profit approach like the district court's here, which "[does] not take into account the impact of extrinsic [market] factors," *Olis*, 429 F.3d at 548, is likely to result in more certain outcomes—in the individual case and in criminal sentencing proceedings viewed nationwide and in the aggregate. *See Mooney*, 425 F.3d at 1101 (reasoning that "[t]he use of actual sales to calculate gain

---

[12](...continued)
commentary must be viewed as operating within the parameters established by the "gain resulting from the offense" language of the guideline provision itself, as discussed *supra* in Part II(B)(3)(b)(i). An insider trading defendant, for example, who possesses material, *negative* nonpublic information and sells her stock to avoid losses that she expects to come when the information is disclosed and the stock price declines gains from her deceit by receiving an additional increment of sales proceeds that does not reflect the inherent value of the stock. Interpreting the commentary's reach with reference to *that* gain, the value from trading would be the portion of the gross proceeds from the defendant's stock sales that reflects the inherent value of the stock and the *increase* in that value would be the additional portion of the sales proceeds that actually is a product of the deceit (i.e., the nondisclosure of the inside information).

provides a clear and coherent bright[-]line rule").  However, the greater certainty that presumably would be the product of such a simplistic approach is not a cardinal objective of federal sentencing in financial fraud cases.  Indeed, the Guidelines expressly contemplate that sentencing computations in financial fraud cases may involve some element of imprecision.  *See* U.S.S.G. § 2F1.1 cmt. n.9 ("[T]he loss need not be determined with precision.  The court need only make a reasonable estimate of the loss, given the available information."); *see also Olis*, 429 F.3d at 547 (noting that "methods adopted in [criminal] cases are necessarily less exact than the measure of damage applicable in civil securities litigation"); *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001) ("[T]he district court [is not] obligated to search for the perfect theoretical or statistical fit. . . . [T]he district court's obligation is to adopt a reasonable realistic, economic projection of loss based on the evidence presented." (internal quotation marks omitted)).  Therefore, it stands to reason that, operating within a wide range of discretion in the financial fraud context, courts likely will arrive at different sentencing outcomes on roughly similar facts and that, consequently, certainty of result cannot be a controlling objective of the Guidelines.

On the other hand, it is axiomatic that a critical objective of federal sentencing is the imposition of punishment on the defendant that reflects his or her culpability for the criminal offense (rather than for the unrelated gyrations of

the market). *See, e.g.*, *United States v. Martinez-Barragan*, 545 F.3d 894, 904 (10th Cir. 2008) (noting that "when crafting a sentence, the district court must be guided by the 'parsimony principle'—that the sentence be 'sufficient, but not greater than necessary, to comply with the purposes' of criminal punishment, as expressed in § 3553(a)(2)" (quoting 18 U.S.C. § 3553(a))). That objective requires, irrespective of the likely greater complexity and imprecision, that district courts undertake "thorough analyses grounded in economic reality," *Olis*, 429 F.3d at 547, when imposing sentences in insider trading cases.

### *iii. Finding Guidance in the Civil Sphere*

Mr. Nacchio's argument is adopted from the civil disgorgement remedy applied in insider trading enforcement cases by the SEC. "In [a civil] insider trading case, the proper amount of disgorgement is generally the difference between the value of the shares when the insider sold them while in possession of the material, nonpublic information, and their market value 'a reasonable time after public dissemination of the inside information.'" *Happ*, 392 F.3d at 31 (quoting *MacDonald*, 699 F.2d at 55); *see, e.g.*, *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 528 (D.N.J. 1999) (reciting the *MacDonald* disgorgement formulation).[13]

---

[13] In the en banc First Circuit's notable *MacDonald* decision, the court examined whether the defendant should be required to disgorge the entire profits from the sale of securities purchased on the basis of insider knowledge or only

(continued...)

Generally speaking, we agree that it is not inappropriate in some situations for sentencing courts to look to the civil sphere for guidance in fashioning a proper criminal sentence. Courts in criminal cases have sought guidance from civil damage measures in considering an estimate of loss from the defendant's unlawful conduct. *See* McCormick, *Untangling Capricious Effects*, *supra*, at 1153 ("Faced with a myriad of new issues never encountered before in the criminal context, the courts have turned to civil jurisprudence for answers."). In *Olis*, which as discussed above highlighted the value of a realistic approach based upon sound economic principles, the court specifically approved of relying on the methodology used to calculate damages in a civil securities fraud case in a criminal fraud case in part "because it is attuned to stock market complexities."

---

[13](...continued)
"an amount representing the increased value of the shares at a reasonable time after the public dissemination of the information." *MacDonald*, 699 F.2d at 52-55 (internal quotation marks omitted). The court disagreed with the district court's decision that the defendant should have to disgorge his entire profits, reasoning that defrauded sellers should recover only the amount they lost before they reasonably could have obtained access to the material nonpublic information at issue. The court thus remanded for the district court to determine a disgorgement figure based upon the price of the stock a reasonable time after dissemination of the inside information to the public. *Id.* at 55. The *MacDonald* court provided the district court a formula for analyzing this market absorption date: "[I]n determining what was a reasonable time after the inside information had been generally disseminated, the court should consider the volume and price at which [the] shares were traded following disclosure, insofar as they suggested the date by which the news had been fully digested and acted upon by investors." *Id.*; *see also Maxxon*, 465 F.3d at 1179 (approving the date that the company first attempted to correct the misleading statements as a cutoff date for disgorgement).

*Olis*, 429 F.3d at 546.

In *United States v. Rutkokse*, the Second Circuit, citing *Dura Pharmaceuticals*, explained that it saw "no reason that the considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." 506 F.3d 170, 179 (2d Cir. 2007) (citing *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)), *cert. denied*, 128 S. Ct. 2488 (2008). It remanded so that the district court could redetermine the sentence with consideration of the extent to which the defendant's fraud—rather than market or other forces—caused shareholders' losses. *Id.* at 179-80; *see also Leonard*, 529 F.3d at 93 n.11 ("[T]he district court may look to principles governing recovery of damages in civil securities fraud cases for guidance in calculating the loss amount for purposes of the Guidelines.").

Criminal cases have the same "tangle of factors affecting price," *Dura Pharm.*, 544 U.S. at 343, that is found in civil cases. It therefore appears to us equally important in criminal cases as in civil cases "to examine the movement of a stock's price after the relevant information is made public in order to determine the proper measure of the illicit profit . . . to be charged to one who traded illegally while in possession of the material, non-public information." *Patel*, 61 F.3d at 140 (calculating losses avoided by defendant due to his selling shares prior to public dissemination of inside information).

-34-

### iv. A Disgorgement Approach

Although we consider it to be appropriate in some situations to seek guidance from civil jurisprudence in performing the criminal sentencing function, and do not hesitate to do so in this case, we must be constrained by the nature of our undertaking in a criminal insider trading matter—that is, determining the *gain* resulting from the offense. It is not our task to determine loss to victims from Mr. Nacchio's crimes. The insider trading guideline commentary expressly rejects victim loss as a metric of culpability. *See* U.S.S.G. § 2F1.2 cmt. background ("Because the victims and their losses are difficult if not impossible to identify, the gain . . . by the defendant . . . is employed instead of the victims' losses."). Therefore, we do not consider it appropriate in a criminal insider trading case to rely upon any of the sophisticated strategies for determining damages for civil plaintiffs, which may be worthy of examination in analogous criminal cases assessing loss.[14] *See* Buell, *Reforming Punishment*, *supra*, at 1613-

---

[14] Consequently, we reject the government's argument that under an approach that takes extrinsic factors such as market absorption into account, "criminal punishment would turn on experts hypothesizing 'what ifs'" and that "'[g]ain' would depend as much on the expert retained and the guesswork permitted as on actual conduct." Aplee. Br. at 65. Like sentencing courts computing monetary measures of culpability in cases involving other types of financial fraud, we nevertheless recognize that in criminal insider trading cases district courts must be sensitive to and appropriately control the institutional costs of sentencing proceedings, with a recognition that the Guidelines expressly contemplate that loss computations will not reflect optimal precision. *Cf. Bakhit*, 218 F. Supp. 2d at 1240 ("Although it may be preferable for the district court to

(continued...)

14, 1628-42 (detailing at great length the strengths and weaknesses of methodologies for computing loss in criminal cases); McCormick, *Untangling the Capricious Effects*, *supra*, at 1163-79 (describing various methodologies (and their flaws) that courts have used to compute loss and noting that the formula and variables applied "can translate into decades of a defendant's life").

Because it seeks to strip the wrongdoer of ill-gotten gains and deter improper conduct, disgorgement provides an appropriate, close-fitting civil analogue. *See Mooney*, 425 F.3d at 1107 n.11 (Bright, J., dissenting) (noting that "'profits and interest wrongfully obtained' from insider trading [in civil cases] clearly bear[] a close relationship to the 'gain resulting from the offense' of insider trading," and so the defendant's gain or profits should be the same

---

[14](...continued)
have the benefit of dueling experts and an extensive tutorial to determine the actual loss with exactitude, that is simply not practical in the vast majority of criminal fraud cases. Most defendants do not have the resources to hire an independent expert and the government has similar financial constraints. Further, when expert testimony involves complicated algorithms, a court may place too much emphasis on a single expert's opinion if it is not also presented with an opposing or independent expert to explain and counter the conclusions."); U.S.S.G. § 2F1.1 cmt. n.9 ("[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."); *see also Leonard*, 529 F.3d at 93 ("Determination of the extent to which the misrepresentations here resulted in an overvaluation of the securities 'cannot be an exact science' . . . ." (quoting *Rutkokse*, 506 F.3d at 179)); Samuel W. Buell, *Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1638 (2007) [hereinafter Buell, *Reforming Punishment*] (noting that, *inter alia*, "empirical limitations of the litigation process . . . and the impetus to avoid burdening the public fisc with expensive and often inconclusive expert contests in criminal cases necessitate compromising some precision").

whether disgorged in a civil case or used to calculate prison time in a criminal case); *see also SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) ("Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."); 3 Bromberg, *Securities Fraud*, *supra*, § 6:334, at 6-892 ("Disgorgement takes away from a violator the benefits of the violation, sometimes referred to as 'illegal profits.'"). The district court will be afforded considerable discretion in applying the approach. *Cf. Maxxon*, 465 F.3d at 1179 ("'Disgorgement is by nature an equitable remedy as to which a trial court is vested with broad discretionary powers.' So long as the end date chosen results in a 'reasonable approximation' of illegal profits there is nothing wrong with the court itself determining that date." (citations omitted) (quoting Arnold S. Jacobs, *Disclosures and Remedies Under the Securities Laws* § 20:109)). *Compare Basic Inc. v. Levinson*, 485 U.S. 224, 248 n.28 (1988) (declining, in discussing the presumption of reliance on the integrity of the market price, "to adopt any particular theory of how quickly and completely publicly available information is reflected in market price"), *with* 3 Bromberg, *Securities Fraud*, *supra*, § 6:338, at 6-898 ("There is considerable variability in determining what is a reasonable time after disclosure and in choosing the specific market price at that time.").[15] However, in doing so, the

_____

[15]     For example, in his briefing and supplemental authority submission,
(continued...)

-37-

court's focus should be on ensuring that the gain figure resulting from the offense excludes to the extent possible, within the institutional constraints of criminal sentencing, factors unrelated to the defendant's criminally culpable conduct.

### v. Policy Considerations

Contrary to the district court's net-profit approach, a disgorgement approach is entirely consonant with central principles of federal sentencing policy in that it endeavors to hold the defendant accountable for the portion of the increased value of the stock that is related to his or her criminally culpable conduct. Consequently, it militates against the creation of unwarranted sentencing disparities among similarly situated defendants.

Federal sentencing is individualized sentencing: the sentencing court seeks to craft a sentence that fully reflects a particular defendant's criminally culpable

---

[15](...continued)
Mr. Nacchio embraces the straightforward disgorgement approach of the *Mooney* dissent. *See, e.g.*, Aplt. Opening Br. at 52 ("The *Mooney* dissent was correct."). However, the $ 1.8 million gain figure that Mr. Nacchio advances as the correct one is based upon a considerably more complex event study by Professor Fischel, which among other things endeavors to track the historical movement of Qwest stock relative to a designated market index. *See* Aplt. App. at 798 ("It is standard practice in event studies to take into account the effect of market factors on stock returns. This is typically done by estimating the historical relationship between changes in a company's stock price and changes in the performance of a market index . . . ."). We appropriately leave it to the district court in the first instance to determine the extent to which such an analysis comports with the disgorgement approach adopted here and the overarching goal of having the gain figure reflect, to the extent possible within the constraints of criminal sentencing, Mr. Nacchio's criminally culpable conduct.

conduct, including the harm caused by it, and the defendant's personal

circumstances. *See United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008)

(discussing the proper methodology for sentencing courts to "perform their

individualizing role"); 18 U.S.C. § 3553(a) (noting the factors that a sentencing

court is obliged to consider including "the nature and circumstances of the

offense and the history and characteristics of the defendant"); U.S.S.G. §

1B1.3(a)(3) (noting that relevant conduct used to determine the Guidelines range

includes "all harm that resulted from the acts and omissions" of the defendant and

"all harm that was the object of such acts and omissions").

However, if the impact of unrelated twists and turns of the market is

ignored in the sentencing calculus then an insider trading defendant is likely to

suffer a sentence that is detached from his or her individual criminal conduct and

circumstances.[16] And this detachment can have a profound, detrimental impact on

_____

[16] We acknowledge that a defendant's sentence may be influenced sometimes by factors outside of the defendant's knowledge and control. Indeed, happenstance and sheer luck (or lack thereof) may play a part in a defendant's sentence for certain crimes under the Guidelines. For example, two otherwise equally culpable bank robbers may face different sentences based solely on the different amounts of money that tellers happened to place in their bags; and two otherwise equally culpable drug trafficking mules may face different sentences based only on the different quantities of drugs that unbeknownst to them were given to them for transport. *See, e.g.*, U.S.S.G. § 2B3.1(b)(7), § 2B3.1 cmt. n.3 (2008) (increasing the offense level for robbery based on the value of the property taken); *id.* § 2D1.1(c) (prescribing the increase in base offense level depending upon the quantity and type of controlled substance). However, that does not mean that federal sentencing is not focused upon imposing punishment based upon an

(continued...)

another objective of federal sentencing—the elimination of unwarranted

disparities between similarly situated defendants.[17]  *See, e.g.*, *Booker*, 543 U.S. at

---

[16](...continued)
individual defendant's criminally culpable conduct.  Although the different circumstances that produce these disparate sentencing outcomes may not have been within the control of the defendants or even within their ken, those circumstances nonetheless stem from, and are closely tied to, their individual criminal activity and the resulting harm—that is, their acts of robbing a bank and demanding money from the teller, and their acts of taking delivery of and ferrying illegal drugs.

Crimes like bank robbery and drug trafficking are thoroughly permeated with illegality.  In contrast, the act of trading in securities—in itself—is entirely lawful.  As relevant here, what makes the act illegal is trading while in possession of material, nonpublic information.  Consequently, a whole host of factors can contribute to the gains or losses that a defendant incurs from trading in stock that have nothing to do with the *criminal* dimensions of his or her activity—factors that relate simply to the ordinary economics and psychology of the marketplace. A sentencing approach that ignores this distinguishing aspect of the insider trading context would be at odds with the individualized sentencing objective of federal sentencing and the related concern pertaining to unwarranted sentencing disparities.  In effectuating these aspects of federal sentencing policy in the insider trader context, sentencing courts must proceed with great care to ensure that the gain attributed to a defendant actually stems from the *criminal* dimensions of his or her stock trading.

[17]  We recognize that the objective of individualized sentencing in some contexts may be viewed as being in tension with the objective of avoiding unwarranted sentencing disparities.  *See, e.g.*, *United States v. Evans*, 526 F.3d 155, 167 (4th Cir.) (Gregory, J., concurring) (noting the "analytical tension" involved in "ensur[ing] that the sentence caters to the individual circumstances of a defendant, yet retains a semblance of consistency with similarly situated defendants"), *cert. denied*, 129 S. Ct. 476 (2008).  In pursuing the former (i.e., individualized sentencing), a sentencing court may mistakenly predicate a sentence on features of an individual defendant that do not actually separate him or her in any meaningful way from the mine-run of defendants who have committed the same or a similar offense, thereby creating unwarranted sentencing disparities among what are in fact similarly situated defendants.  However, the

(continued...)

-40-

253-54 (noting that the sentencing statutes' goal of increased uniformity consists not just of similar sentences for violations of the same statute but also "of similar relationships between sentences and real conduct").

Therefore, from a policy perspective, it makes sense to adopt a sentencing approach that is focused on a defendant's criminally culpable conduct and has the effect of excising—even if not completely—unrelated market forces from the sentencing calculus, thereby narrowing the zone of unpredictability in sentencing.[18]  Such is the disgorgement approach we adopt here: it takes into consideration the fact that stocks have inherent value (quite apart from criminally fraudulent conduct) and seeks to exclude that unrelated value from the computation of a defendant's punishment, and it sets a logical, temporal cutoff point for assessing the gain of the illegal conduct, i.e., the point when the information is disclosed and absorbed by the market.

A hypothetical offered in the *Mooney* dissent, which is paraphrased here, provides a clear example of how the district court's interpretation of the insider

---

[17](...continued)
concern here is the imposition of sentences based upon factors completely unrelated to an individual defendant's criminal culpability.  In that situation, there is a danger that others who share the same or a similar degree of criminal culpability will not receive like sentences because the court's sentences are not in significant part actually predicated on criminal culpability at all—thus, creating unwarranted sentencing disparities.

[18]     It is not possible to *entirely* exclude chance market forces from an inside trader's gain calculation.  As discussed further below, *see infra* note 23, a disgorgement approach cannot insulate itself from this reality.

trading guideline—calculating gain as total value realized, absent consideration of how much is tied to unrelated market forces—can yield sentences that are detached from defendants' individual criminal culpability and, relatedly, can give rise to undesirable and unwarranted sentencing disparities. *See Mooney*, 425 F.3d at 1107 (Bright, J., dissenting). We are asked to imagine three corporate executives who each, simultaneously and with the same material, *positive* nonpublic information, buy 1,000 shares of stock at $5 per share. The stock purchases are the criminally culpable conduct, that is, the acts of insider trading. The information is disclosed four weeks later; after the fifth week, the information has been absorbed by the market and is reflected in the stock price. *Id.* On the day that it can be said that the positive information has been absorbed, the stock price has risen to $15 per share.

On the market-absorption day, Officer A sells his 1,000 shares, making $10,000—"all of which is illicit gain, [as it arose] entirely from his exploitation of insider knowledge." *Id.* Officers B and C retain their shares. Three months later, the stock price has risen to $50 per share. Officer B sells and pockets total gains of $45,000—$10,000 of which is attributable to his exploitation of the insider knowledge, and $35,000 "owing to the ordinary vagaries of the market, untainted by any deception." *Id.* Six months later, the market crashes, and Officer C sells out for $2 a share, sustaining a loss. *Id.*

Each officer "committed the same crime, with the same effect on the

market." *Id.* Under the district court's interpretation, however, each officer would receive a different gain calculation under the insider trading guideline. The proceeds (i.e., gain) from their insider trading would be assessed at the time they sold their shares. Officers A and B would receive different increases to their offense levels, and Officer C would receive no increase at all. As the hypothetical illustrates, the district court's interpretive approach would produce sentences divorced from individual criminal culpability. The sentences imposed on Officers B and C would not take into account the fact that stocks have inherent value; the purported gain amounts attributable to them actually were the product of the ordinary gyrations of the market in valuing their stock, *not* their criminal conduct in trading on inside information—as the information had long since been disclosed. Furthermore, the hypothetical demonstrates that a consequence of the delinking of the sentence from individual criminal culpability is undesirable and unwarranted sentencing disparities as to otherwise equally culpable defendants.[19]

---

[19]    Although the government argues that in a situation such as the *Mooney* hypothetical, a sentencing court could depart or vary from the Guidelines as needed to impose a reasonable sentence, it is troublesome to accept a reading of the Guidelines that requires the court to take such action simply to fulfill the mandate of providing an individualized, reasonable sentence. *Cf. United States v. Nichols*, 376 F.3d 440, 443 (5th Cir. 2004) (rejecting the district court's reliance on the disparity between the sentence of an insider trading defendant and his codefendants' as the grounds for a departure because the disparity resulted from factors already taken into consideration by the Guidelines). The suggestion that a variance or departure would be the way to adjust for situations such as the hypothetical is additionally problematic in that having multiple defendants in an

(continued...)

Moreover, examined in a context like this one where an insider sells stock on the basis of material, nonpublic information, important weaknesses of the district court's approach also are clear.[20] Take for example a scenario involving three corporate officers who are in possession of the same material, *negative*

------

(...continued)
insider trading case is hardly an exceptional situation and thus resort to such adjustments necessarily would not be an infrequent occurrence.

[20]    The *Mooney* hypothetical illustrates in very stark fashion the flaws in the district court's approach, which permits unrelated market gyrations to significantly impact sentencing outcomes.  The starkness of the hypothetical is at least partly a product of the type of insider trading at issue—the *buying* of company stock while in the possession of material, nonpublic information.  In such a situation, the *proceeds* (i.e., the effects) of the already completed criminal conduct ordinarily would be assessed when the stock is sold.  As the *Mooney* hypothetical demonstrates, that assessment could take place long *after* the information had been disclosed and absorbed by the market and the crime has ended.  Consequently, under the district court's approach, at the time that the proceeds of the insider trading are measured, the value of the stock could have been almost entirely determined by market movements unrelated to the insider trading itself.  Arguably, the flaws of the district court's approach are not in such high relief here, where the insider trading relates to the *sale* of company stock while possessing material, nonpublic information.  In order to be a crime at all, the sales must take place before the information is fully disclosed to the public.  *See, e.g.*, *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993) ("It is, of course, axiomatic that trading on public information does not violate Section 10(b) . . . . Once the information is fully impounded in price, such information can no longer be misused by trading because no further profit can be made.").  Therefore, even under the district court's approach, the factual scenario here would not give rise to a situation where sentencing computations were based upon sales *after* the information was disclosed and absorbed by the market.  Such sales would not be illegal; nor would their proceeds be ill-gotten gains.  However, as demonstrated in text, a hypothetical based upon a situation like Mr. Nacchio's is nonetheless instructive concerning the weaknesses of the district court's approach.

nonpublic information while their company's stock is selling at $35 a share.[21]

Assume that each received 1000 stock options as part of their compensation, with an exercise cost of $10 per share. Officer X elected to exercise her 1000 options and sell her shares while the stock was selling at $35, making a profit of $25,000. Aware that the stock had been experiencing an upward trend and, hopeful that it would continue, Officer Y delayed exercising her options. However, because of negative industry developments (unrelated to the officers' criminally fraudulent conduct), the stock price actually took a nose dive. While it was at $20 per share, Officer Y exercised her options and sold her shares, making a profit of $10,000. For whatever reason, Officer Z was late to react to the negative market developments and did not exercise her options and sell her shares until the stock price was $10 per share. Officer Z made no profit. When the negative information was ultimately disclosed and absorbed by the market, the price of the stock had settled at $5 per share.

---

[21] The hypothetical sketched here is quite simple. We intend for it to illustrate in a very general way some of the weaknesses of the district court's gain calculation approach and the reasons that we consider our approach to be a better one when viewed in light of federal sentencing policy. Our analysis related to the hypothetical is not aimed at creating an inflexible playbook to control the district court's gain analysis upon remand. Once the focus is properly centered upon the gain resulting from Mr. Nacchio's insider trading offense (i.e., upon the increase in value realized due to the *criminal* dimensions of his stock trading), then the district court will have considerable discretion to consider a number of variables in arriving at an appropriate gain figure. We do not establish an exact formula here for arriving at that figure.

Under the district court's approach, although having committed equally blameworthy conduct in trading on the same material, nonpublic information, their sentences would be computed based upon very different gain figures. Officer X's base offense level under the Guidelines would be enhanced four levels based upon a profit of $25,000 under § 2F1.2(b)(1) (incorporating by reference § 2F1.1(b)(1)). Officer Y's would be enhanced two levels based upon a profit of $10,000. And Officer Z's would not be enhanced at all, because she made no profit.

By ignoring the inherent value of the stock, the district court's approach would divorce the sentencing assessment of gain from the defendant's individual culpability.[22] It would, therefore, run counter to key purposes of federal

---

[22]    Indeed, the extent to which the district court's sentencing approach allows for sentences that are not calibrated based upon criminal culpability is underscored by focusing on option costs. In our hypothetical, we assumed that the officers received stock options with the same exercise cost. However, in the real world, this may well not be the case. The exercise cost of an option "[i]n practice" is "almost always set equal to the grant-date market price." Murphy, *Explaining Executive Compensation*, *supra*, at 863; *see also Greene*, 210 F.3d at 1243 (noting that the option price is "typically the market price on the date the options are granted"); Michael B. Dorff, *The Group Dynamics Theory of Executive Compensation*, 28 Cardozo L. Rev. 2025, 2057 (2007) (noting that "boards nearly universally set the options' exercise price at the market price the day the options are granted"). Therefore, if a given set of executives receive their compensation-related options on different days and the market price of the company's stock is different on those days, then the executives are likely to have options with different prices. It cannot be disputed that option cost is a business variable that ordinarily is entirely unrelated to the *criminal* dimensions of stock trading. Yet, under the district court's approach, differences as to this wholly unrelated factor could have significant sentencing consequences. For instance, in a scenario involving two corporate officers, Officer A and Officer B, who are in

(continued...)

sentencing: individualized sentencing and the avoidance of unwarranted sentencing disparities. The disgorgement approach adopted here would not have similar effects.

For example, it would take into consideration the value of the stock after the information was disclosed and absorbed by the market—that is, the $5 stock price. That $5 figure ordinarily would be the amount subtracted from the market price of each share of stock at the respective times the officers engaged in sales transactions; in other words, it would be the common subtractive figure.

---

[22](...continued)
possession of the same material, negative nonpublic information, let us assume that each received 1000 stock options as part of her compensation, but with different exercise costs. Officer A received options with an exercise cost of $10 per share; getting hers on a different day, Officer B received options with an exercise cost of $25 per share. Each decides to trade (i.e., exercise her options and sell the shares) while their company's stock is selling at $35 per share. When the information is ultimately disclosed and absorbed by the market, the company's stock price drops to $5 per share. Under the district court's sentencing approach—which focuses on net profit—Officer A and Officer B would be exposed to markedly different Guidelines sentencing ranges because of this unrelated option-cost variable. With a net profit of $25,000, Officer A's baseline figure for gain purposes would result in a four level enhancement, while Officer B's $10,000 net profit would only lead to a two level enhancement. In every material respect, however, the criminal culpability of Officer A and Officer B would be the same; their sentences should reflect that. Under our disgorgement approach, they would. That approach would not factor into the sentencing equation the wholly unrelated factor of option exercise-cost differences. In each instance, we typically would subtract the price of the stock when the information was disclosed and absorbed by the market (i.e., $5) from the sales price of the stock (i.e., $35 per share) and multiply by the number of shares. The equally culpable officers, A and B, would be held accountable for the same gain resulting from the offense and would be sentenced accordingly.

Consequently, our approach would better capture the increase in value received by the defendant due to *unlawful* trading in securities, as directed by the relevant guideline and its commentary. *See* U.S.S.G. § 2F1.2 cmt. background (calculating gain as "the total *increase* in value realized" rather than just "total value realized"—indicating that shares already have value (emphasis added)).

Furthermore, consistent with the focus on defendant culpability, the sentencing court could properly take into consideration the unrelated negative industry developments and their impact on the stock price. To the extent that the stock-price effects of those negative developments could be isolated with sufficient certainty, the sentencing court ordinarily should exercise its discretion to exclude, to the extent feasible, those effects. *See* 3 Bromberg, *Securities Fraud*, *supra*, § 6:337, at 6-897 ("Can a defendant reduce the amount of disgorgement by demonstrating that other factors accounted for part of his or her profit? . . . [I]t seems reasonable to allow this in insider trading disgorgement cases . . . ."); *cf. SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("[W]e believe the government's showing of appellants' actual profits on the tainted transactions at least presumptively satisfied that burden [as to the amount of disgorgement]. Appellants . . . were then obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation. Defendants . . . may make such a showing, for instance, by pointing to intervening events from the time of the violation."); Buell, *Reforming Punishment*, *supra*, at 1640 (noting that "[i]n

-48-

cases in which an event unrelated to the fraud plainly caused a significant change in share price, either during the fraud or in the period after revelation [but before market absorption], the court should modify the loss figure").

Accordingly, to a greater extent than the district court's, our approach is consonant with the purposes of federal sentencing. Therefore, even viewed solely from a policy perspective, it would be a more appropriate means to determine a defendant's gain resulting from the offense.[23]

---

[23] To be sure, even under a disgorgement approach, there could be differences in sentencing outcomes due to unrelated market forces if multiple defendants trade on inside information at different temporal points. *See* 3 Bromberg, *Securities Fraud*, *supra*, § 6:337, at 6-896 to -897 ("Measuring disgorgeable profit . . . by change in the market prices assumes that all changes in market price of the security are attributable to the material information on which the violator traded. This, of course, may not be true. The price changes may be influenced by, even dominated by, other factors affecting the issuer of the security . . . ."). For example, in our hypothetical, using a common subtractive figure of $5 per share, the gain figure would be different for the officers: Officer X's gain resulting from the offense would be $30,000; Officer Y's would be $15,000; and Officer Z's would be $5000. (The precise gain figures used here contemplate that the defendants (whom we may safely assume would bear the evidentiary burden) would not be able to isolate with a sufficient degree of certainty the stock-price effects of the unrelated negative industry developments, such that the district court would seek to exclude those effects from the sentencing calculus.) Consequently, the base offense levels of the officers also would be different, increasing, respectively, by four, three, and two levels. Notably, the disgorgement approach still would yield a better overall result from the perspective of federal sentencing policy than the district court's. Each defendant who traded on the same inside information would get at least *some* enhancement; whereas under the district court's net-profit approach, one defendant (i.e., Officer Z) who suffered a loss would be scot-free. Nevertheless, we accept that it is not possible to *entirely* exclude chance market forces from an inside trader's gain calculation. We do not, however, attempt to achieve this

(continued...)

-49-

### 4. Conclusion

We conclude that the district court's net-profit sentencing approach does not square with the plain language of the relevant guideline, § 2F1.2; therefore, we reject it. We further determine that district courts must undertake "thorough analyses grounded in economic reality," *Olis*, 429 F.3d at 547, when sentencing defendants in insider trading cases and deem it appropriate to look to the civil sphere for guidance regarding the proper approach. We conclude that the civil disgorgement remedy provides an appropriate guidepost for sentencing in insider trading cases. Lastly, we highlight that the conclusion we reach based upon on reading of the text of the relevant guideline is consonant with key objectives of federal sentencing policy. The district court's net-profit sentencing approach allows the extent of the punishment imposed on defendants such as Mr. Nacchio to

---

[23](...continued)
unrealistic objective here. Rather, we simply seek to minimize the influence of factors other than a defendant's unlawful acts on the calculation of punishment, thereby reducing unwarranted sentencing disparities between similarly situated defendants. Like the bank robbery and drug trafficking examples discussed *supra* at note 16, although the variation in the gain amounts may result in part from some chance market developments, the sentencing analysis would be focused on holding the individual defendants accountable for the *criminal* dimensions of their stock trading. Therefore, the range of possible extraneous economic factors that might influence the gain amount would thereby be narrowed and so would the range of possible sentencing disparities. And, where unrelated events can be identified and it is clear that they have affected the share price, it would be consistent with the analytic approach we outline here for the district court, in an exercise of its discretion, to seek to exclude those effects of those events from the gain computation.

be figuratively imposed "on the throw of the dice—the ups and downs of the stock market." *Mooney*, 425 F.3d at 1108 n.12 (Bright, J., dissenting) ("[U]ntil today I did not realize that sentences can rest on the gamble of the stock market . . . ."). This contravenes important objectives of federal sentencing—specifically, sentences should reflect the individual criminal culpability of defendants and avoid unwarranted sentencing disparities.

Mr. Nacchio is entitled to resentencing under the principles outlined above. On remand, the district court should focus on arriving at a figure that more closely approximates Mr. Nacchio's gain *resulting from the offense* of insider trading.

### III. FORFEITURE

As required by Fed. R. Crim. P. 32.2, the indictment filed against Mr. Nacchio provided notice of the government's intention to seek forfeiture of a sum of money "representing the amount of proceeds obtained as a result of the offenses" "[u]pon conviction of one or more of the offenses alleged in Count(s) 1 through 42" "pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1956(c)(7)(A), 18 U.S.C. § 1961(1)(D), and 28 U.S.C. § 2461(c)." Aplt. App. at 69. Mr. Nacchio appeals the district court's order that he forfeit approximately $52 million. He argues that the district court erred in requiring him to forfeit his gross proceeds rather than his net profit. According to Mr. Nacchio, under the terms of the forfeiture statute he should be required to forfeit no more than approximately $44.6 million, which comprises his gross proceeds from the unlawful trades less

brokerage commissions and fees and the cost of exercising the options.[24]  We review questions of statutory interpretation de novo.  *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007).

The civil forfeiture provision, made applicable here by 28 U.S.C. § 2461(c), calls for the forfeiture of the proceeds traceable to numerous felony offenses, including "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)."  18 U.S.C. § 981(a)(1)(C).  It is undisputed that such "specified unlawful activity" includes, *inter alia*, the insider trading offenses for which Mr. Nacchio was convicted.  The parties dispute, however, how to calculate the traceable proceeds—i.e., the amount to be forfeited.  The district court accepted the government's view that the proceeds should be defined under 18 U.S.C. § 981(a)(2)(A), which is applied to cases involving "illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes."  *Id.* § 981(a)(2)(A).  Under this provision, proceeds are "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture," and are "not limited to the net gain or profit realized

---

[24]  Although at one point Mr. Nacchio had argued that his forfeiture amount should be much less—the $1.8 million gain figure calculated by his expert report—he stipulated to the district court that "the only challenges he will raise to the forfeiture amount sought by the United States relate to the legal issue of what deductions, if any, should be made from the $52,007,545.47 sought by the United States—i.e., whether taxes, fees, and option costs should be deducted or not." Aplt. App. at 1030 (internal quotation marks omitted).

from the offense." *Id.*; *cf. United States v. Santos*, 128 S. Ct. 2020, 2024 (2008) (noting that Congress defined "proceeds" in § 981(a)(2)(A) to mean "receipts"). Thus, the district court calculated Mr. Nacchio's forfeitable proceeds to be $52,007,545.47—his gross proceeds from the relevant time period.

Mr. Nacchio argues on appeal, as he did to the district court, that his proceeds should instead be calculated under 18 U.S.C. § 981(a)(2)(B), which provides:

> In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. . . . The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(B).

According to Mr. Nacchio, insider trading involves "lawful goods" sold "in an illegal manner" rather than an unlawful activity as described in § 981(a)(2)(A). In other words, because trading in securities is generally a lawful activity and securities are generally lawful goods, the offense of trading based upon inside information involves "lawful goods . . . sold in an illegal manner." *Id.* Thus, Mr. Nacchio asserts, his forfeitable proceeds should consist of "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services"—i.e., his net profit of $44.6

million, rather than his gross proceeds. *Id.*; *cf. Santos*, 128 S. Ct. at 2024 (noting that Congress defined "proceeds" in § 981(a)(2)(B) to mean "profits"); *see also Santos*, 128 S. Ct. at 2031-32 (Stevens, J., concurring) (noting that under § 981(a)(2)(B) Congress specifically provided that "'proceeds' must allow for the deduction of costs").

The district court's determination that subsection (B) was inapplicable was based on its determination that: (1) because the offense of insider trading is included as a "specified unlawful activity" in § 981(a)(1)(C), it must also fall within the "unlawful activities" of § 981(a)(2)(A); and (2) "a security is not a good, it is a commodity." Aplt. App. at 1231-32. We disagree with the first conclusion and find that the second conclusion is not correct under the facts of this case. For the reasons outlined below, we conclude that Mr. Nacchio's forfeiture should be calculated under § 981(a)(2)(B) as "the amount of money acquired . . . less the direct costs incurred." Thus, Mr. Nacchio should be required to forfeit his net profit, rather than the gross proceeds, of his insider trading offenses.

First, we are not convinced that every "specified unlawful activity" laid out as subject to a forfeiture order under § 981(a)(1)(C) also must be one of the "unlawful activities" of subsection (A) to which the gross receipts definition of "proceeds" is applied. The district court and the government rely on *United States v. All Funds on Deposit in United Bank of Switz., N.Y.*, 188 F. Supp. 2d 407 (S.D.N.Y. 2002), for this proposition. In *All Funds*, the court reasoned that the

-54-

term "unlawful activities" in the civil forfeiture provisions "is a term of art," such that the "unlawful activities" in § 981(a)(2)(A) include "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7) and referenced in § 981(a)(1)(C). *Id.* at 410. Thus, the court reasoned, "the definition of the forfeitable proceeds" for any of the "unlawful activities" "is solely provided by § 981(a)(2)(A), and not in any respect by § 981(a)(2)(B)." *Id.* Essentially, *All Funds* held that the currency transfer crimes at issue in that case—undisputedly involving "specified unlawful activities"—automatically fell within the category of "unlawful activity," and only § 981(a)(2)(A) applied. *See id.*

However, we find the reasoning of a more recent case from another judge from the same court to be more persuasive here.

> In short, *All Funds* found that the term "unlawful activities" as used in section 981(a)(2)(A) includes all "*specified* unlawful activit[ies]" as defined in 18 U.S.C. § 1956(c)(7). While mail fraud and wire fraud are "specified unlawful activities" under sections 1956(e)(7)(A) and 1961(1)(D), this Court disagrees with the *All Funds* reading of the statutes at issue. If Congress had meant "specified unlawful activity," a defined term in the money laundering statute, it would have used that precise term—as it did in section 981(a)(1)(C)—instead of the looser term "unlawful activities" used in section 981(a)(2)(A). Moreover, the *All Funds* reading of the statutes would render section 981(a)(2)(B) nugatory because almost every predicate crime listed in section 981(a)(1)(C) is also a "specified unlawful activity" listed in section 1956(c)(7), leaving only a handful of statutes involving counterfeiting, forgery, explosive materials, and fraudulent identification documents as possible candidates for the definition of "proceeds" given in section 981(a)(2)(B). Sections 981(a)(2)(A) and 981(a)(2)(B) should be read together, and both sections must have meaning.

*United States v. Kalish*, No. 06 Cr. 656(RPP), 2009 WL 130215, at *7 (S.D.N.Y. Jan. 13, 2009) (alteration in original); *cf.* 1 David B. Smith, *Prosecution and Defense of Forfeiture Cases*, ¶ 5.03[2], at 5-62 n.8 (2008) [hereinafter Smith, *Forfeiture Cases*] ("[U]nder [the *Nacchio* district court's] decision the proceeds of every section 981(a)(1) offense fall under the broad definition of subsection (A), and subsection (B) becomes a null set . . . .").

While Mr. Nacchio's offense of insider trading falls within "specified unlawful activities" pursuant to § 981(a)(1)(C), we similarly conclude that this fact does not automatically render it an "unlawful activity" under § 981(a)(2)(A). Congress "would have used that precise term" (i.e., "specified unlawful activities") in both places if it had meant for the two provisions to be coterminous in terms of the covered offenses. *Kalish*, 2009 WL 130215, at *7; *see also* 1 Smith, *Forfeiture Cases*, *supra*, ¶ 5.03[2], at 5-62 ("The term 'unlawful activities' in section 981(a)(2)(A) was meant to cover inherently unlawful activities such as robbery that are not captured by the words 'illegal goods' and 'illegal services.'"). Therefore, because insider trading does not by virtue of being a "specified unlawful activit[y]" constitute an "unlawful activity" such that only § 981(a)(2)(A) applies, the issue becomes whether this case involves "unlawful activities" as per subsection (A) or "lawful goods" sold in an illegal manner as per subsection (B). As securities themselves generally are lawful, the threshold issue is whether they

can be considered goods. Under the facts of this case,[25] we find that the securities

at issue are "lawful goods" that were sold in an illegal manner; thus, §

981(a)(2)(B) applies.

First, in looking at the plain language of the statute and giving "goods" its

ordinary meaning, *see United States v. Plotts*, 347 F.3d 873, 875-76 (10th Cir.

2003), we note that (contrary to the district court's comments) it is far from an

"elementary observation" that "a security is not a good."[26] Aplt. App. at 1231.

While a leading legal reference offers a definition of "goods" as "[t]hings that

have value, tangible or not," that same reference also provides a definition of the

term, appearing in the Uniform Commercial Code, that excludes investment

securities. *Black's Law Dictionary* 714. The parties' competing definitions and

the very broad meanings associated with both "security" and "good" render these

classifications anything but elementary. *Cf. id.* at 1384-85 (noting that "security"

carries a "'broad statutory definition'" and a wide range of items—including items

that clearly are goods in at least one sense, such as scotch whiskey, cosmetics,

---

[25] Though the government argues that Mr. Nacchio's interpretation would lead to separate forfeiture schemes for inside buying and inside selling because § 981(a)(2)(B) does not expressly extend to purchases, we note that our holding is narrowly limited to the facts of this case and a purchasing scheme is beyond our consideration here.

[26] Moreover, "since *both* subsections speak . . . in terms of 'goods' and 'services,' it is not apparent how the court's observation that a security is neither supports the court's conclusion that securities fraud falls under subsection (A)." 1 Smith, *Forfeiture Cases*, *supra*, ¶ 5.03[2], at 5-62 n.8.

rabbits, cemetery lots, and fruit trees—"'have all been held to be securities within the meaning of federal or state securities statutes'" (quoting 1 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation*, § 1.5, at 28-29 (3d ed. 1995))); *id.* at 714 (simultaneously defining "goods" as "[t]angible or movable personal property other than money" and as "[t]hings that have value, *whether tangible or not*" (emphasis added)).

Thus, the government's and district court's assertion that securities cannot be lawful goods is not supported by the plain language of the statute. Further, as outlined above in regard to the gain calculation, the securities at issue (consonant with the definition of the term "good") were not inherently valueless items: rather, they were "[t]hings that ha[d] value" and were not rendered worthless by the offenses. *Id.* at 714. Mr. Nacchio was not participating in an inherently unlawful activity by selling Qwest stock; trading, by itself, would not have been an unlawful activity. Rather, the illegality inhered in his selling securities ("lawful goods") in an unlawful manner, i.e., "on the basis of material, nonpublic information." *See O'Hagan*, 521 U.S. at 651-52; 1 Smith, *Forfeiture Cases*, *supra*, ¶ 5.03[2], at 5-62 & n.8. Therefore, we hold that under the specific facts of this case, Mr. Nacchio's acts of insider trading involved lawful goods sold in an illegal manner. Thus, § 981(a)(2)(B) should be applied to calculate Mr. Nacchio's forfeiture amount; the proceeds subject to forfeiture are subject to deduction of

direct costs.[27]  Because the district court applied the wrong legal framework, we will reverse.[28]

## IV.  CONCLUSION

Based upon the foregoing, we **REVERSE** the district court's sentencing order with respect to its gain calculation and its forfeiture determination and **REMAND** for resentencing consistent with this opinion.

---

[27]    The government argues that even under § 981(a)(2)(B), it would be erroneous to deduct the exercise costs of the options Mr. Nacchio received as this amount was not "incurred" in the subsequent illegal sales.  We express no opinion on whether the costs to exercise the options should be deducted alongside brokerage fees as the district court can revisit that issue in recalculating the forfeiture amount under the proper provision.

[28]    Mr. Nacchio additionally argues that imposition of a $19 million fine, when combined with a $44.6 million (or, ostensibly, a $52 million) forfeiture order, raises "a serious Eighth Amendment question" because it "would represent a penalty 35-times greater than the $1.8 million gain."  Aplt. Opening Br. at 54 (citing *Alexander v. United States*, 509 U.S. 544, 558-59 (1993) ("[T]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." (internal quotation marks omitted))).  "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  We need not reach this contention of error, however.  In light of our earlier rulings, currently there is no gain figure against which to measure the alleged disproportionality of the fine-forfeiture pairing.  The district court will determine Mr. Nacchio's gain resulting from the offense upon resentencing.  In addition, Mr. Nacchio does not argue that either his fine or his forfeiture, considered separately, would be unlawful; he asserts only that the fine, *taken together with* the forfeiture, constitutes an unconstitutional "excessive fine."  Assuming that the fine and forfeiture amounts would be considered in tandem for Eighth Amendment purposes, our disposition of Mr. Nacchio's forfeiture order nullifies his Eighth Amendment argument; at this time, there is no set forfeiture amount.  The district court will determine the exact forfeiture amount upon resentencing.